



**F I L E D**

SEP 3 0 1999

Phil Lombardi, Clerk
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

AUSA Life Insurance Company, Inc., Peoples Benefit Life        )
Insurance Company a/k/a Providian Life & Health Insurance      )
Company, PFL Life Insurance Company, Monumental Life           )
Insurance Company, Bankers United Life Assurance Company,      )
AmerUs Life Insurance Company, BlackRock 2001 Term Trust,      )
Inc., BlackRock Strategic Term Trust, Inc., BlackRock Investment )
Quality Term Trust, Inc., BlackRock Broad Investment Grade 2009 )
Term Trust, Inc., BlackRock Fixed Income Opportunity Fund,     )
BlackRock Advantage Term Trust, Inc., Obsidian Onshore Fund,   )
BlackRock Financial Management, Inc., Commercial Guaranty      )
Assurance, Ltd., St. George Holdings, Ltd., St. George Investments )
I, Ltd., St. George Investments III, Ltd., GFC St. George, Ltd.,  )
CGA Investment Management, Inc., KRE Reinsurance, Ltd., Kern   )
County Employees' Retirement Association, State of Ohio, Bureau )
of Workers' Compensation, Security Life and Trust Insurance    )
Corporation, Southwestern Life Insurance Company, AIG          )
Hyperion EURIBOR ABS Fund plc f/k/a AIG-Hyperion PIBOR         )
ABS Fund plc, Arkansas Teacher Retirement System, The          )   Case No.
Hyperion Total Return Fund, Inc., Enhance Reinsurance Company, )
Keyport Life Insurance Company, Hyperion Capital Management,    )   JURY TRIAL DEMANDED
Inc., Life Insurance Company of Georgia, Lion II Custom         )
Investments LLC, Security Life of Denver Insurance Company,     )
Southland Life Insurance Company, First Columbine Life          )
Insurance Company, Midwestern United Life Insurance Company,    )
Golden American Life Insurance Company, USG Annuity & Life      )
Company, ING Investment Management, Inc., Curtis Bay Insurance  )
Co., Ltd., St. George Corporation, A.F. Portfolio Limited, Bayer )
Corporation Master Trust, Unisys Master Trust, R.J. Reynolds    )
Company Defined Benefit Master Trust, Nabisco Inc. Defined      )
Benefit Trust, Western Asset Management Company, Chrysler       )
Insurance Company, Hotchkis and Wiley Low Duration Fund,        )
Hotchkis and Wiley Total Return Bond Fund, Hotchkis and Wiley   )
Balanced Fund, Hotchkis and Wiley Short-Term Investment Fund,   )
Foodmaker Master Retirement Trust, Triangle Distribution        )
Company Profit Sharing Plan Trust, AMR Investment Services      )
Balanced Portfolio, ML Life Insurance Company of New York, and  )
Merrill Lynch Life Insurance Company,                          )
                                                               )
                              Plaintiffs,                      )
                                                               )
            vs.                                                )
                                                               )

99CV0825C (J)

C/J fees
forms SI

William R. Bartmann, Kathryn A. Bartmann, Gertrude A. Brady,   )
Jay L. Jones, Michael C. Temple, Charles D. Welsh and Chase   )
Securities, Inc.,   )
   )
                  Defendants.   )
   )

## COMPLAINT

### NATURE OF THE ACTION

1.     Plaintiffs are institutional investors who purchased, own, insured or guaranteed more than $600 million in securities issued in one of the largest Ponzi schemes in U.S. history. They bring this action against the executives and investment bankers who devised, promoted and operated this scheme while concealing its fraudulent foundations.

2.     At the center of the scheme was Commercial Financial Services, Inc. ("CFS"), once the nation's largest collector of delinquent credit card debt. Defendants are CFS' founders and key executives, as well as Chase Securities, Inc., its investment banker, who touted CFS as "the largest, best trained, and most efficient debt collection operation in the world." Defendants sold over $1.6 billion in original face amount of asset-backed securities. The securities were backed by billions of dollars of delinquent credit card receivables that CFS purchased from banks and ultimately transferred to bankruptcy remote trusts, created by CFS affiliates, that actually issued the securities. Investors were to receive payments of principal and interest on the securities based upon CFS' ability to "service" these receivables and collect from the credit card obligors. In connection with the sale of these securities, Defendants represented that they reasonably expected that CFS would collect from the credit card obligors at levels that so significantly exceeded the thresholds necessary to pay investors their principal and interest that these securities were a high quality investment suitable for the Plaintiffs.

3.     But those representations were false and misleading.  In reality, CFS' operations were in disarray, and the company consistently failed to collect from credit card obligors at the levels Defendants represented that it had collected in the past and would collect in the future.  To conceal its failures and to meet the monthly debt service on the notes, CFS instead sold a substantial amount of the credit card receivables that backed the notes purchased by Plaintiffs. CFS also structured sham bulk sale transactions to Dimat, a company formed by CFS executives to further the scheme, and funded Dimat's purchases with funds generated from later note offerings.  Defendants reported the proceeds of these sales as "collections" in monthly reports to investors and in offering materials for subsequent securitizations.  All the while, CFS, its executives and Chase Securities continued to lure new investors to the securitizations and to assure existing investors with false representations that CFS' actual collections met or exceeded predicted levels.

4.     Defendants' scheme imploded in the fall of 1998.  In a letter dated September 30, 1998, an anonymous whistle-blower publicized the desperate measures taken to conceal CFS' actual collections performance and the massive and systemic failures of CFS' collections operation.  In October 1998, CFS publicly confirmed that "there appears to be some basis" for certain of the statements in the anonymous letter.  These disclosures resulted in the immediate ratings downgrade of all CFS-sponsored securitizations, stanching the flow of capital to CFS. After reporting nearly $400 million in net revenues, $182 million in net income and $259 million in shareholders' equity as of December 31, 1997, CFS sought protection under the Bankruptcy Code in December 1998.  CFS is now liquidating its remaining assets.

5.     The Defendant CFS executives and Chase Securities either knew or were deliberately reckless in not knowing that securities were being sold to investors like Plaintiffs on

the basis of misleading misrepresentations and omissions of material facts including, among

other things, that CFS misrepresented and concealed the truth about its "collections"

performance, that CFS employed a collection model that could not predict future performance

and that CFS had been selling the credit card receivables it was servicing for investors in order to

make its monthly collection statistics and payments to the investors.

6.       Chase Securities, CFS and its top executives violated legal duties owed to

Plaintiffs by failing to disclose these and other material facts to Plaintiffs, and by

misrepresenting the true state of affairs in connection with the securitization program.

Defendants, under the Securities Exchange Act of 1934, the Oklahoma Securities Act, and the

securities laws of several other States, and under the common law, therefore must compensate

Plaintiffs for the hundreds of millions of dollars in damages Plaintiffs have suffered as a result of

Defendants' misrepresentations and omissions and otherwise unlawful conduct as set forth

herein.

<u>PARTIES</u>

**<u>PLAINTIFF NOTEHOLDERS</u>**

<u>The AEGON Plaintiffs</u>

7.       Plaintiff Peoples Benefit Life Insurance Company, known as Providian Life and

Health Insurance Company until October 1, 1998, is a corporation organized under the laws of

the State of Missouri with its principal place of business in the State of Pennsylvania.

8.       Plaintiff PFL Life Insurance Company is a corporation organized under the laws

of the State of Iowa with its principal place of business in the State of Iowa.

9.       Plaintiff AUSA Life Insurance Company, Inc. is a corporation organized under

the laws of the State of New York with its principal place of business in the State of New York.

10.     Plaintiff Monumental Life Insurance Company is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of Maryland. Peoples Security Life Insurance Company and Commonwealth Life Insurance Company were merged into Monumental Life Insurance Company on November 30, 1998.

11.     Plaintiff Bankers United Life Assurance Company is a corporation organized under the laws of the State of Iowa with its principal place of business in the State of Iowa.

12.     Providian Capital Management ("Providian"), now known as Diversified Financial Products, Inc., served as investment advisor to and agent of Providian Life and Health Insurance Company and Commonwealth Life Insurance Company in connection with the SMART 97-2 and SMART 97-4 transactions.  In or about June 1997, Providian Life and Health Insurance Company, Commonwealth Life Insurance Company and Peoples Security Life Insurance were acquired by affiliates of AEGON.  After September 1, 1997, AEGON USA Investment Management, Inc. ("AEGON") served as investment advisor to and agent of Providian Life and Health Insurance Company, Commonwealth Life Insurance Company and Peoples Security Life Insurance.  AEGON also was, in connection with the securities purchases complained of herein, the agent of and investment advisor to Peoples Security Life Insurance Company, Commonwealth Life Insurance Company, and Plaintiffs PFL Life Insurance Company, Life Investors Insurance Company of America, AUSA Life Insurance Company, Inc., Monumental Life Insurance Company, Bankers United Life Assurance Company and Peoples Benefit Life Insurance Company.  All these Plaintiffs are referred to collectively herein as the "AEGON Plaintiffs."

The AmerUs Plaintiff

13.     Plaintiff AmerUs is a corporation organized under the laws of the State of Iowa with its principal place of business in the State of Iowa.

The BlackRock Plaintiffs

14.     Plaintiff BlackRock 2001 Term Trust, Inc. is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of New York.

15.     Plaintiff BlackRock Strategic Term Trust, Inc. is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of New York.

16.     Plaintiff BlackRock Investment Quality Term Trust, Inc. is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of New York.

17.     Plaintiff BlackRock Broad Investment Grade 2009 Term Trust, Inc. is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of New York.

18.     Plaintiff BlackRock Fixed Income Opportunity Fund is a corporation organized under the laws of the Cayman Islands with its principal place of business in the State of New York.

19.     Plaintiff BlackRock Advantage Term Trust, Inc. is a corporation organized under the laws of the State of Maryland with its principal place of business in the State of New York.

20.     Plaintiff Obsidian Onshore Fund is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of New York.

21.     Plaintiff BlackRock Financial Management, Inc. ("BlackRock") is a corporation organized under the laws of the State of Delaware, with its principal place of business in the

State of New York. BlackRock is the agent of and investment advisor to Plaintiffs BlackRock

2001 Term Trust, Inc., BlackRock Strategic Term Trust, Inc., BlackRock Investment Quality

Term Trust, Inc., BlackRock Broad Investment Grade 2009 Term Trust, Inc., BlackRock Fixed

Income Opportunity Fund, BlackRock Advantage Term Trust, Inc. and Obsidian Onshore Fund,

and all such Plaintiffs are referred to collectively herein as the "BlackRock Plaintiffs."

The CGA Plaintiffs

22.     CGA Group, Ltd. ("CGA Group") is a holding company organized under the laws

of Bermuda and domiciled in Hamilton, Bermuda.

23.     Plaintiff Commercial Guaranty Assurance, Ltd. ("CGA") is an insurance

company organized under the laws of Bermuda, with its principal place of business in Hamilton,

Bermuda. CGA is a wholly-owned subsidiary of CGA Group.

24.     Plaintiffs St. George Holdings, Ltd. ("SGH"), St. George Investments I, Ltd.

("SG-1"), St. George Investments III, Ltd. ("SG-3"), and GFC St. George, Ltd. ("GFCSG") are

limited liability companies organized under the laws of the Cayman Islands, with their principal

place of business in Hamilton, Bermuda. SG-1, SG-3, and GFCSG are wholly owned

subsidiaries of SGH. SG-1, SG-3, SGH, and GFCSG are investment vehicles organized for the

purpose of making investments in asset-backed and other fixed-income securities.

25.     Plaintiff CGA Investment Management, Inc. ("CGAIM") is a corporation

organized under the laws of Delaware, with its principal place of business in New York,

New York. CGAIM is wholly owned by CGA Group. CGAIM is registered as an investment

advisor with the United States Securities and Exchange Commission. CGAIM served as the

investment advisor to, and agent of, SG-1, SG-3, SGH, and GFCSG in connection with their

purchases of asset-backed securities issued in the SMART 97-5, SMART 97-6, SMART 98-1, and GREAT 98-A transactions.

26.     Capital Re Corporation ("Capital Re Corp.") is an insurance holding company established under the laws of Delaware, with its principal place of business in New York, New York.

27.     Capital Re Management Corp. ("Capital Re Management") was, at all times relevant to this Complaint, a marketing company established under the laws of New York, with its principal place of business in New York, New York.  Capital Re Management was a wholly owned subsidiary of Capital Re Corp.  On February 26, 1999, Capital Re Management changed its name to Capital Re Solutions, Inc.

28.     Plaintiff KRE Reinsurance, Ltd. ("KRE") is a reinsurance company established under the laws of Bermuda, with its principal place of business in Hamilton, Bermuda.  KRE is a wholly owned subsidiary of Capital Re Corp.

29.     CGA, CGAIM, SG-1, SG-3, SGH, GFCSG, and KRE are, as applicable, hereinafter collectively referred to as the "CGA Plaintiffs."

The Hyperion Plaintiffs

30.     Plaintiff Kern County Employees' Retirement Association ("KCERA") is a retirement system organized pursuant to the California County Employees' Retirement Act of 1937 with its principal place of business in California.

31.     Plaintiff State of Ohio, Bureau of Workers' Compensation ("OBWC") is a state insurance fund organized under the laws of the State of Ohio with its principal place of business in Ohio.

32.      Plaintiff Security Life and Trust Insurance Corporation, formerly known as
Integon Life Insurance Corp. ("Security Life") is an insurance corporation organized under the
laws of the State of Texas with its principal place of business in Texas.

33.      Plaintiff Southwestern Life Insurance Company ("Southwestern Life") is an
insurance corporation organized under the laws of the State of Texas with its principal place of
business in Texas.

34.      Plaintiff AIG-Hyperion EURIBOR ABS Fund plc, formerly known as
AIG-Hyperion PIBOR ABS Fund plc ("EURIBOR") is a variable capital company organized
under the laws of Ireland with its principal place of business in Ireland.

35.      Plaintiff Arkansas Teacher Retirement System ("ATRS") is a retirement system
organized under the laws of the State of Arkansas with its principal place of business in
Arkansas.

36.      Plaintiff The Hyperion Total Return Fund, Inc. ("HTR") is a corporation
organized under the laws of the State of Maryland with its principal place of business in
New York.

37.      Plaintiff Enhance Reinsurance Company ("Enhance") is a stock insurance
company organized under the laws of the State of New York with its principal place of business
in New York.

38.      Plaintiff Keyport Life Insurance Company ("Keyport") is an insurance
corporation organized under the laws of the State of Rhode Island with its principal place of
business in Massachusetts.  (KCERA, OBWC, Security Life, Southwestern Life, EURIBOR,
ATRS, HTR, Enhance and Keyport are collectively referred to herein as the "Hyperion
Plaintiffs.")

39.     Plaintiff Hyperion Capital Management, Inc. ("HCM") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York. HCM served as investment advisor to and agent of each of the Hyperion Plaintiffs in connection with the SMART and GREAT transactions. (HCM and the Hyperion Plaintiffs are collectively referred to herein as "Hyperion.")

The ING Plaintiffs

40.     Plaintiff Life Insurance Company of Georgia is a corporation organized under the laws of the State of Georgia with its principal place of business in the State of Georgia.

41.     Plaintiff Lion II Custom Investments LLC is successor in interest to Indiana Insurance Company and Peerless Insurance Company and is a limited liability company organized under the laws of the State of Delaware with its principal place of business in the State of Georgia.

42.     Plaintiff Security Life of Denver Insurance Company is a corporation organized under the laws of the State of Colorado with its principal place of business in the State of Colorado.

43.     Plaintiff Southland Life Insurance Company is a corporation organized under the laws of the State of Texas with its principal place of business in the State of Georgia.

44.     Plaintiff First Columbine Life Insurance Company is successor in interest to Columbine Life Insurance Company and a corporation organized under the laws of the State of Colorado with its principal place of business in the State of Colorado.

45.     Plaintiff Midwestern United Life Insurance Company is a corporation organized under the laws of the State of Indiana with its principal place of business in the State of Colorado.

46.    Plaintiff Golden American Life Insurance Company is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Pennsylvania.

47.    Plaintiff USG Annuity & Life Company is a corporation organized under the laws of the State of Oklahoma with its principal place of business in the State of Iowa.

48.    ING Investment Management, Inc. ("ING") is a corporation organized under the laws of the State of Georgia, with its principal place of business in the State of Georgia.  ING is the agent of and investor advisor to Plaintiffs Life Insurance Company of Georgia, Lion II Custom Investments LLC, Security Life of Denver Insurance Company, Southland Life Insurance Company, First Columbine Life Insurance Company, Midwestern United Life Insurance Company, Golden American Life Insurance Company and USG Annuity & Life Company and all such Plaintiffs are referred to collectively herein as the "ING Plaintiffs."

The Western Asset Management Plaintiffs

49.    Plaintiff Curtis Bay Insurance Co., Ltd. is a corporation organized under the laws of Bermuda, with its principal place of business in Bermuda.

50.    Plaintiff St. George Corporation is a corporation organized under the laws of the State of Illinois, with its principal place of business in Illinois.

51.    Plaintiff A.F. Portfolio Limited is a corporation organized under the laws of Bermuda with its principal place of business in Bermuda.

52.    Plaintiff Bayer Corporation Master Trust is a trust organized under the laws of the State of Pennsylvania, with its principal place of business in Pennsylvania.

53.    Plaintiff Unisys Master Trust is a trust organized under the laws of the State of New York, with its principal place of business in Pennsylvania.

54.     Plaintiff R.J. Reynolds Company Defined Benefit Master Trust is a trust organized under the laws of the State of New York, with its principal place of business in North Carolina.

55.     Plaintiff Nabisco Inc. Defined Benefit Trust is a trust organized under the laws of the State of New York, with its principal place of business in New Jersey.

56.     Plaintiff Western Asset Limited Duration Portfolio is a corporation organized under the laws of the State of Maryland, with its principal place of business in California.

57.     Plaintiff Western Asset Management Company is a corporation organized under the laws of the State of California, with its principal place of business in California ("Western Asset").  Western Asset is the agent and advisor to Curtis Bay Insurance Co., Ltd., St. George Corporation, A.F. Portfolio Limited, Bayer Corporation Master Trust, Unisys Master Trust, R.J. Reynolds Company Defined Benefit Master Trust, Nabisco Inc. Defined Benefit Trust, and Western Asset Limited Duration Portfolio, and all such plaintiffs are referred to collectively herein as the "Western Asset Plaintiffs".

The Stein Roe Plaintiffs

58.     Plaintiff Keyport Life Insurance Company is a corporation organized under the laws of the State of Rhode Island, with its principal place of business in Massachusetts.

59.     Plaintiff Chrysler Insurance Company is a corporation organized under the laws of the State of Michigan with its principal place of business in Michigan.

60.     Stein Roe & Farnham Incorporated is the agent and advisor to Chrysler Insurance Company and Keyport Life Insurance Company, and these plaintiffs are referred to collectively herein as the "Stein Roe Plaintiffs."

The H&W Plaintiffs

61.     Plaintiff Hotchkis and Wiley Low Duration Fund is a business trust organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in California.

62.     Plaintiff Hotchkis and Wiley Total Return Bond Fund is a business trust organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business in California.

63.     Plaintiff Hotchkis and Wiley Balanced Fund is a business trust organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in California.

64.     Plaintiff Hotchkis and Wiley Short-Term Investment Fund is a business trust organized under the laws of the Commonwealth of Massachusetts with its principal place of business in California.

65.     Plaintiff Foodmaker Master Retirement Trust is a trust organized under the laws of the State of Illinois with its principal place of business in Illinois.

66.     Plaintiff Triangle Distributing Company Profit Sharing Plan Trust is an employee benefit plan trust organized under the laws of the State of California, with its principal place of business in California.

67.     Plaintiff AMR Investment Services Balanced Portfolio is a series of the AMR Investment Services Trust, a common law trust organized under the laws of the State of New York, with its principal place of business in Texas.

68.     Hotchkis and Wiley is a division of Merrill Lynch Asset Management, L.P. ("H&W").  H&W is an investment advisor registered under the Investment Advisers Act of

1940, and has acted at all relevant times with investment discretion for Hotchkis and Wiley Low Duration Fund, Hotchkis and Wiley Total Return Bond Fund, Hotchkis and Wiley Balanced Fund, Hotchkis and Wiley Short-Term Investment Fund, Foodmaker Master Retirement Trust, Triangle Distributing Company Profit Sharing Plan Trust, and AMR Investment Services Balanced Portfolio.  All such plaintiffs are referred to collectively herein as the "H&W Plaintiffs."

The ML Plaintiffs

69.     Plaintiff ML Life Insurance Company of New York ("MLLICNY") is an insurance company organized under the laws of the State of New York, with its principal place of business in New Jersey.

70.     Plaintiff Merrill Lynch Life Insurance Company ("MLLIC") is an insurance company organized under the laws of the State of Arkansas, with its principal place of business in New Jersey.

71.     Merrill Lynch Asset Management, L.P. ("MLAM") is an investment advisor registered under the Investment Advisers Act of 1940, and has acted at all relevant times with investment discretion for MLLICNY and MLLIC.  MLLICNY and MLLIC are referred to collectively herein as the "ML Plaintiffs."

Keyport Life Insurance Company

72.     Plaintiff Keyport Life Insurance Company is an insurance corporation organized under the laws of the State of Rhode Island, with its principal place of business in Massachusetts.

73.     Miller Anderson & Sherred was agent of and advisor to Keyport Life.

## DEFENDANTS

74.     CFS is a subchapter S corporation organized under the laws of the State of

Oklahoma and headquartered in Tulsa, Oklahoma.  But for the automatic stay under Section 362

of the Bankruptcy Code, 11 U.S.C. § 362, CFS would be named as a defendant in this action.

75.     Defendant Chase Securities, Inc. ("Chase Securities") is a corporation organized

under the laws of the State of Delaware with its principal place of business in the State of

New York.

76.     Defendant William Bartmann ("Bartmann") is an individual and, on information

and belief, a citizen and resident of the State of Oklahoma.  Bartmann was a founder of CFS and

served as chairman of its board of directors and as its president.

77.     Defendant Kathryn Bartmann is an individual and, on information and belief, a

citizen and resident of the State of Oklahoma.  Kathryn Bartmann served as Chief Executive

Officer of CFS.

78.     Defendant Jay Jones is an individual and, on information and belief, a citizen and

resident of the State of Oklahoma.  Jones was a founder of CFS and served as its Executive Vice

President, Director of Technology Planning.

79.     Defendant Gertrude Brady is an individual and, on information and belief, a

citizen of the State of Florida.  Brady served as CFS' director of investor relations, and, in that

capacity, was a key liaison between CFS and Plaintiffs and other outside parties, and was

responsible for supervising the preparation of investor reports and requests for reports from

rating agencies, lenders and others.

80.     Defendant Michael Temple is an individual and, on information and belief, a

citizen and resident of the State of Oklahoma.  Temple served as CFS' chief financial officer

and, in that capacity, was responsible for all aspects of accounting policy, the accuracy of the financial statements, preparation of the pro forma analysis of cash equity and borrowing capacity, and providing information to outside investors and rating agencies.

81.     Defendant D. Charles Welsh is an individual and, on information and belief, a citizen of the State of Oklahoma.  Welsh was Managing Director-Credit for CFS, and in that capacity was responsible for all facets of servicing collection, workout and disposition of asset portfolios serviced by CFS.

82.     Bartmann, Jones, Brady, Temple and Welsh were members of CFS' Executive Committee, and are referred to collectively herein as the "CFS Executive Defendants."

## JURISDICTION

83.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and pursuant to its supplemental jurisdiction over those claims that do not arise under federal law.

## VENUE

84.     Venue is proper in this district because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district and one or more defendants are subject to personal jurisdiction in this district (to the extent there is no district in which the action otherwise may be brought) pursuant to 28 U.S.C. § 1391.

## FACTUAL OVERVIEW

### Commercial Financial Services, Inc.

85.     CFS was formed in 1986 by William Bartmann, his wife, Kathryn Bartmann, and Jay Jones.  On information and belief, Bartmann and Jones, together with Kathryn Bartmann, have owned at least 97% of the common stock of CFS since its inception.

86.     CFS' initial business was collecting on delinquent home mortgage loans that CFS purchased from the Federal Deposit Insurance Corporation and the Resolution Trust Corporation. In 1995, CFS began purchasing delinquent credit card receivables "charged-off" by credit card issuers who had ceased their own efforts to collect.  CFS purchased charged-off receivables from some of the nation's largest VISA, MasterCard and Discover credit card issuers.  By 1997, CFS was the largest purchaser and servicer of charged-off credit card receivables in the United States, had over 3,000 employees, and reported annual net revenues of approximately $396 million, annual net income of approximately $182 million, and shareholders' equity of approximately $259 million.

<u>The Asset-Backed Securities Sold to Plaintiffs</u>

87.     In 1995, CFS began to engage in a new form of financing for the company, sponsoring asset-backed securitizations.  From May 1995 through September 1998, CFS sponsored 13 credit card asset-backed securitizations, raising approximately $1.6 billion.

88.     Specifically, CFS created, through intermediate affiliates, special purpose bankruptcy remote trusts (the "Trusts") that sold notes to Plaintiffs and other investors and used the proceeds of such sales to purchase portfolios of credit card receivables from CFS.  The credit card receivables were transferred to the Trusts at a substantial profit to CFS.  Simultaneous to the sale of notes, the Trusts also engaged CFS to collect the purchased credit card receivables pursuant to contracts known as the "Servicing Agreements" that paid CFS from 15% to 25% of the amounts collected.

89.     As structured, the Trusts were to use the net collections generated by CFS to make interest and principal payments to the noteholders until the Trusts completely extinguished

the debt evidenced by the notes.  Any amounts collected in excess of that necessary to retire the notes belonged to CFS.

90.    Between August 1996 and February 1998, nine more "SMART" securitization transactions closed, each having a structure largely similar to the SMART 96-2 transaction.  The following is a chart of closing dates of each of these SMART transactions.

| **Transaction** | **Closing Date** |
|---|---|
| SMART 96-2 | June 19, 1996 |
| SMART 96-3 | August 27, 1996 |
| SMART 96-4 | December 23, 1996 |
| SMART 97-1 | February 7, 1997 |
| SMART 97-2 | March 6, 1997 |
| SMART 97-3 | April 10, 1997 |
| SMART 97-4 | August 6, 1997 |
| SMART 97-5 | September 29, 1997 |
| SMART 97-6 | December 10, 1997 |
| SMART 98-1 | February 27, 1998 |

91.    Central to Plaintiffs' decisions to purchase the notes issued by the Trusts was CFS' represented ability to service the credit card debt sold to the Trusts.  Because the Trusts had no significant assets or sources of funds other than the credit card receivables, repayment of principal and interest owed on the notes depended on CFS' ability to collect from the credit card obligors.  Consequently, a substantial portion of the marketing effort for the securities focused on (1) the strengths of CFS' management, systems, operations, personnel and procedures; (2) CFS' historic collection performance levels; and (3) the predictive validity of the collection model CFS developed to show what potential noteholders could expect CFS to collect based on CFS' past performance and purportedly proven debt collection expertise.

### Representations Concerning CFS' Historic Performance

92.     CFS, the CFS Executive Defendants and Chase Securities marketed the SMART offerings on the basis of representations in the private placement memoranda, due diligence books and other written and oral communications with investors that CFS had a proven track record of collecting non-performing loans in general and credit card receivables in particular and that historically, CFS' actual performance exceeded its forecasted performance in collection of the credit card receivables.  These Defendants also emphasized to Plaintiffs in each SMART offering that CFS' performance in past SMART transactions always exceeded expectations as forecast by its proprietary collections model.

93.     As another marketing initiative, the CFS Executive Defendants and Chase Securities distributed "Progress Reports" to Plaintiffs and other potential investors in advance of each SMART offering.  These Progress Reports consisted of charts and graphs purporting to show that CFS' actual cumulative collection statistics met or exceeded predictions for each outstanding CFS securitization.

94.     CFS and the CFS Executive Defendants made additional representations concerning CFS' actual collections performance in separate "Monthly Statements" sent to Plaintiffs' investment advisors and other noteholders of each outstanding securitization.  Each Monthly Statement set forth, among other things, tables purporting to show that CFS' actual cumulative collections met or exceeded "base case" or were at least very near "base case," a key performance measure established at the formation of a trust.  Plaintiffs relied on the Monthly Statements they were sent from earlier investments made by them or their affiliates in deciding to participate in subsequent transactions.

95.     CFS and Chase Securities also referred Plaintiffs — through Private Placement Memoranda ("PPMs") issued in connection with the CFS securitizations — to Duff & Phelps' February 1997 "Special Report" containing representations: (1) that CFS had a "proven track record in collecting nonperforming loans in general and credit cards in particular"; (2) that "as of Dec. 31, 1996, CFS had liquidated approximately 57,000 [charged-off credit card] loans, achieving 109% of the forecasted cash recovery"; and (3) "CFS has proved itself expert in . . . realizing payment on distressed accounts."

Representations Regarding CFS' Collections Model

96.     The CFS Executive Defendants and Chase Securities also marketed the SMART offerings to Plaintiffs on the basis of representations that CFS was making good faith estimates of the amounts it would collect from the SMART portfolios that were based upon its historical collection experience.

97.     Each private placement memorandum distributed by Chase Securities included representations that, after evaluating each credit card receivable, CFS assigned an "estimated cash recovery" ("ECR") that reflected CFS' "good faith best estimate" of the amount of cash it expected to recover from the receivable "based on CFS' own capabilities." The private placement memoranda also represented that the ECR assigned by CFS reflected, among other considerations, CFS' "historical collection experience with respect to nonperforming assets."

98.     Marketing materials prepared and distributed by the CFS Executive Defendants and Chase Securities, including Due Diligence Books, contained purported estimates by CFS of amounts it would collect in connection with particular offering. The Due Diligence Books represented that CFS' estimate was "based upon CFS' historical collection experience" and upon "historic collections levels." Defendants stated that CFS' expected collection for each SMART

securitization was based on the reported attributes of the credit card debt, the collection efforts to

date on the debt, the information gathered to date on the obligors and assumptions about CFS'

supposed superior collection abilities.  The CFS collection model then generated two collection

scenarios, one called "base case" and the second, assuming a more pessimistic collection

expectation, called the "stress case."  Under either scenario, CFS estimated that it would collect

more than enough from the credit card receivables in the Trusts to pay off the principal and

interest on the notes.

<u>Representation Concerning CFS' Abilities, Systems Operations and Procedures</u>

99.     CFS and Chase Securities also marketed the SMART and GREAT Transactions

on the basis of representations regarding the purported strengths of CFS' abilities, systems,

operations, personnel and procedures for collecting delinquent credit card receivables.  The

private placement memoranda supplied to Plaintiffs by Chase Securities and CFS referred

potential investors to a Standard & Poor's publication containing representations that CFS had

"superior procedures" and "stringent internal controls," and was "one of the premier loan

collectors in the U.S."  The PPMs also referred prospective investors to a Duff & Phelps

publication containing representations that CFS used a "well-organized and procedurally

controlled methodology" in collecting loans; "had excellent computer systems"; and that Duff &

Phelps knew of no other company that purchased, securitized and serviced charged-off credit

card receivables "with the effectiveness of CFS."

100.     The PPMs also represented that "CFS specialize[d] in due diligence review,

valuation and servicing of non-performing consumer loans solely on behalf of affiliated entities

which purchase such loans and on behalf of trusts which purchase the loans from one of CFS'

affiliates as part of a securitization transaction."  The PPMs further represented that for each loan

held in the SMART or GREAT Trusts, CFS' staff of account officers "contacts, and arranges for the payment of each Loan, with the applicable obligors."

101.    The CFS Executive Defendants and Chase Securities also spoke at length during due diligence meetings with Plaintiffs in Tulsa about CFS' supposed sophisticated skip-tracing software and databases that, within a matter of minutes, allowed CFS to produce lists of addresses, contacts, phone numbers and other data with which CFS could locate borrowers that had evaded other collection agencies.  It also was represented that CFS purportedly kept track of all contacts CFS had with an obligor, as well as a history of settlements offered and the obligors' performance to date.  This method of keeping track of obligor information supposedly not only aided the collection of debt, but also allowed management to assure that CFS complied with the Fair Debt Collection Practice Act and similar state laws.

<u>The Representations Were False and Misleading</u>

102.    The cited representations by CFS concerning CFS' historical performance, the validity of CFS' collection predictions, and the purported strengths of its systems, operations, strengths and procedures were false or grossly misleading because CFS concealed several significant material facts, including:  that CFS' operations were in disarray; that its data base did not include complete or current information for many of the credit card obligors; that CFS was unable to fulfill its servicing obligations without raising cash through additional securitizations; and that beginning by at least September 1996, CFS' actual monthly collections from credit card obligors consistently lagged behind CFS' initial "base case" predictions.

103.    As early as December 18, 1996, Charles Welsh, Director of CFS' Credit Group, expressed his concerns in an e-mail to Bartmann:

Sometime ago you told me to advise you when I saw a real problem developing. Well, it probably comes as no surprise to you that we have one in [SMART] 961. I don't have the answers and you will probably consider it treason that I even send you this but I am concerned and am becoming convinced that in the next 30-60 days we will fall woefully short of our objectives in this particular securitization. To continue to deliver at a $2 million plus level for the next year or more seems practically impossible. This month we are projecting $1.4 million as of today and need almost twice that. By approving everything I can have available I can possibly reach the $2 million level, but January brings a whole new batch of concerns.

In reviewing the status of the accounts with the department heads it is obvious we have fewer and fewer assets of sizable balance from which to draw the settlement funds needed to make up the monthly shortfall. You have already seen the quality of the deals we find ourselves approving each month to make it happen. At some point there is little to make it happen from and even at great discount it is no longer possible. I am reinforcing the need to work the accounts for payments on a daily basis, but any increase there will be extremely short of the monthly goal. The situation is very critical. I regret the negative tone and message of this memo and assure you outside the edges of this page I will support and insist on the goal achievement as always. But between you and me I have great concern and to a degree some fear that I cannot win this battle.

104.    To cover up its collection problems, CFS turned to monthly bulk sales of credit card receivables to obtain immediate infusions of cash necessary to meet interest and principal payments and to report collection results in line with the performance standards established by its model. These bulk sales were essential for CFS to meet its base case collections and to perpetuate Defendants' securitization program. An internal CFS e-mail message dated August 12, 1997, and authored by Bruce Hadden, CFS' Director of Business Development stated CFS' dilemma: "If we don't close our sales, we don't make August numbers as a company, and trust me, that is not a good thing." A later internal e-mail message from Hadden, dated April 10, 1998, was even more blunt: "No sales, no revenue. No revenue, the securitizations bust. The securitizations bust, no CFS. It's really that simple."

105.    Beginning at least by January 1997, and continuing until at least September 30, 1998, on or about the final day of virtually every month CFS sold, in bulk, millions of dollars of

credit card receivables from many of the SMART portfolios.  Without disclosing to existing or

prospective investors that CFS had sold any such receivables, CFS reported the proceeds of these

sales as "collections" in its Monthly Statements to investors, the "Progress Reports" and other

marketing materials used to solicit new investors.  Additionally, CFS continued to make

representations similar to Bartmann's statement in an April 8, 1998 letter to investors,

co-authored by Chase Securities, that "CFS prides itself on being at or ahead of base case"

predictions on every securitization.

106.    CFS sold credit card receivables from the Trusts during the period January 1997

through August 1997 to unaffiliated loan collectors.  In so doing, CFS sold off the best credit

card receivables for an amount substantially below both what CFS predicted it would collect on

such receivables and what CFS would have obtained had it followed the collection procedures

described in its marketing materials.  Selling the best credit card receivables in this fashion also

left CFS with a higher percentage of hard to collect or uncollectable credit card receivables.

107.    The credit card receivable "sales" CFS executed after August 1997 were sham

transactions that had no rational economic basis other than to allow Defendants to continue to

mask CFS' performance problems and to close additional securitizations and haul in millions of

dollars in fees and additional income.  By the summer of 1997, CFS could no longer attract bulk

purchasers because CFS already had liquidated the best credit card receivables from the SMART

portfolios.  Beginning in September 1997, and continuing until disclosure of the September 30,

1998 anonymous letter, CFS instead "sold" receivables from several of the SMART Trusts to

Dimat Corporation ("Dimat"), an entity incorporated in September 1997 just before its first

purchase of credit card receivables from the SMART portfolios.  On information and belief,

Dimat is or was owned, funded and controlled, directly or indirectly, by CFS co-founder,

shareholder, and director Jones. Many of the sales to Dimat were made without fully executed contemporaneous documentation of the terms of sale. Dimat paid approximately $63 million over the course of one year for receivables that, on information and belief, had an aggregate expected collection value of less than $11.8 million. Reporting these sales as "collections" further overstated CFS' reported collections performance.

108.    Dimat had no assets other than the credit card receivables it purchased from CFS. Bartmann and CFS financed Dimat's $63 million purchases of SMART receivables through payments to Jones in the amount of $50,750,000 for shares of Jones's CFS stock and approximately $14 million distributed as "dividends" on his CFS stock. Jones then contributed those payments to Dimat, which used the money to purchase receivables from the Trusts, thereby enabling the Trusts to make payments to noteholders. CFS and the CFS Executive Defendants thus created the classic Ponzi scheme, using cash generated from later SMART note offerings to pay the principal and interest on earlier issued notes.

109.    Plaintiffs are informed and believe that a second method CFS used to conceal its true performance was to report substantial numbers of credit card receivables as having been "converted" from "non-performing" to "performing" receivables when in fact such credit card receivables were not "performing." A "converted" account indicated that CFS and the obligor had reached agreement on a monthly repayment schedule designed to retire the obligation. CFS failed to advise Plaintiffs of the substantial numbers of obligors who had defaulted on their negotiated repayment schedule with CFS, a material omission that itself rendered the reported statistics for "converted" accounts grossly misleading.

110.    The CFS Executive Defendants knew that CFS' reports to Plaintiffs and other investors were inaccurate and misleading. An e-mail message from Welsh to Jones and Brady in

January 1997 stated: "Some delinquent accounts are really current and conversely some current accounts are really delinquent. We are talking in the hundreds of accounts not just one or two. Therefore our delinquency reporting is unreliable. . . . [T]his problem will only get worse and poses a serious problem for Gertrude Brady in her reporting not to mention our total inability to measure performance in the performance area."

111.    CFS hired Mitchell Vernick in or about January 1997 to become CFS' new chief executive officer. By February 1997, Vernick saw some of the critical problems with CFS' operations. Vernick also quickly learned of the CFS' bulk sales of credit card receivables. On February 26, 1997, for example, he received an e-mail from Charles Welsh regarding the bulk sales made out of the SMART 96-1 portfolio:

> In 96-1 Bruce has two sale packages with selling prices of $1.767 million and $994,178 respectively. With the additional $1.7 million in collection projected we will deliver a total of nearly $4.4 million in 96-1 in February. This will also deplete 96-1 of a large portion of its marketable assets for the time being. I would like to hold the posting of the smaller sale package. . . . This would give us a . . . head start on March and alleviate the need to sell assets next month in 961.

112.    As Vernick wrote in May 1997 upon his resignation, having spent only a few months on the job:

> As each week that I have been at CFS has past, I have grown increasingly concerned about the viability of our securitization model. In the first couple of months I assumed that I did not understand enough about the business to draw intelligent conclusions. After observing some of the organizational ineffectiveness in Credit, I hoped that re-engineering would explain the continued and growing miss from Base Case performance. However, as I have recently focused on the trends in every securitization and compared this to the increasing levels of performance required in the Base Cases, I am convinced no amount of improvement in productivity can offset this growing differential. Assuming there continues to be a market to sell performing loans to, part of this differential can be offset for a while, but it prematurely consumes cash flow that will create a larger deficit later in the life of the securitization. While I believe there is a way to improve total collections from the track they are on today through a combination of re-engineering, better management, and more favorably timed asset sales in relation to market conditions, I do not believe this can come close to Base Case

projections, either in terms of monthly timing or collections in total.  I am not
certain if even the Stress Case can be made over the life of the securitization, as
the collectability of assets two, three, and four years out is very unclear given the
fall-off in new transactions even six months into securitizations.

Given my concerns about the performance of securitizations, I am no longer
comfortable representing to investors that they are making a risk-reward decision
that has a one-third performance cushion, or that I have a high confidence that
they will be repaid in full.  I realize that making such statements to investors
would cause transactions to either not be rated or have the advance rate reduced to
the point where no cash could be taken-out of the deal.  If CFS cannot create cash
by doing new deals, it will not be able to fund current overhead and will need to
make drastic cuts in expenses in order to live within the cash flow from servicing
fees.  These cuts are likely to be even more severe than contemplated in Mike
Temple's "going out of business" servicing analysis, since Mike's analysis
assumed we collected the Base Case cash flows, and I believe the reality will be
substantially lower, further lowering servicing fees.

*    *    *    *

I realize, however, you see the situation different than I do.  You have stated that
you believe that some combination of better management and possibly some
connection with a company like "Global Finance" will bring performance levels
back to Base Case.  I respect your opinion, and you may be correct, but all my
instincts lead me to the opposite conclusion.  Given my conclusion, I can no
longer lead the company under the present operating model.  Therefore, I believe
I must resign immediately, as it is unfair to you and to investors to remain, given
my views.  Bill, this is not at all an issue of our relationship or how I have been
treated – . . .  Rather, this is an issue of professional integrity – something I must
do, unhappy as it is for me, to maintain my professional integrity. . . .

<u>Defendants' Deliberate Efforts To Conceal the Truth</u>

113.    CFS, the CFS Executive Defendants and Chase Securities deliberately concealed

the critical problems of the CFS debt collection operation from noteholders and prospective

investors, including Plaintiffs.  Instead of accurately reporting CFS' collection performance, the

lack of an effective skip trace system, the disorganized condition of its obligor information and

the inadequacies in its systems and procedures, all of which hampered its ability to collect debt

and stay in compliance with the Fair Debt Collection Practices Act ("FDCPA"), Defendants

instead continued to represent that CFS had superior debt collection experience and abilities.

When CFS turned to bulk sales of credit card receivables to cover up its poor collection performance, Defendants kept such sales secret from Plaintiffs and investors, knowing that if the sales were revealed, they could no longer sell CFS as the premier debt collector that it, in truth, was not.

114.   For example, Defendants gave false and misleading explanations for the unusually low reported collection results for March 1997 and March 1998.  During an April 1997 telephone conference arranged by Bartmann, Brady and Chase Securities, Plaintiffs were told that the March 1997 decline in collections resulted from non-recurring operational issues.  They were not told that CFS had sold millions of dollars of their credit card receivables in bulk in January and February, and had sold none in March.

115.   Bartmann and Chase Securities gave another misleading explanation for a similar drop in collections during March 1998.  In an April 8, 1998 letter to SMART certificateholders, Bartmann and Chase Securities stated "a number of reasons" for the dramatic decline in reported "collections":

> As you know, CFS prides itself on being at or ahead of base case in pool factor reductions and many other statistics in each and all of its securitizations.
>
> Unfortunately, the March 1998 performance (see attached) in 7 of the 10 SMART asset pools was not supportive of that track record.  There are a number of reasons, but no excuses, on the part of CFS for this performance.  One reason is CFS' decision to staff CFS on a 24-hour-a-day, 7-day-a-week basis which resulted in uncertainty and disruption for 3500 CFS staffers.  Additionally, in March CFS did not fully optimize its predictive dialer system.  Finally, as our business grows, we are acquiring more and more obligors with multiple credit cards owned by CFS.  These obligors present special issues regarding FDCPA compliance.  Frankly, we did not make adjustments quickly enough to address these situations.  The result was a weak collections month for SMART transactions through 97-4.

\* \* \* \*

> We have high confidence that March was an operational glitch as opposed to a fundamental problem because the weakness was not isolated to any particular securitization.

The April 8 letter made no reference to the sales of credit card receivables, or the fact that no such sales were made during March 1998. Michael Zarilli of Chase Securities had substantial input into that letter. The letter urged investors to call Zarilli or any member of the "Chase Team" with questions concerning the situation at CFS. Defendants repeated these misrepresentations and omissions in subsequent conversations concerning investments in the GREAT 98-A Trust, including during a May 1998 meeting in Chicago.

116.    CFS, the CFS Executive Defendants and Chase Securities also concealed the material facts underlying Vernick's resignation. In a telephone conference with SMART certificateholders in June 1997, CFS' Bartmann and Brady and Michael Zarilli of Chase Securities falsely stated that Vernick resigned because of "philosophical differences" between Bartmann and Vernick centering on operational issues such as how CFS organized collections teams.

117.    The CFS Executive Defendants as well as Michael Zarilli and other representatives of Chase Securities spoke to Vernick concerning the reasons for his "resignation" both before and after he "resigned" on or about May 30, 1997. Neither the CFS Executive Defendants nor Chase Securities disclosed to Plaintiffs Vernick's views about CFS' operations, the validity of CFS' predictions or its model, CFS' inability to collect on the debt held in the SMART portfolios, or on any of the other matters set forth in Vernick's letter.

## The GREAT Securitizations

118.   In or about May 1998, CFS and Chase Securities began to contact Plaintiffs and other investors in an attempt to convince them to exchange their SMART notes for notes to be issued by a Master Trust called the "Global Rated Eligible Asset Trust 1998-A" or "GREAT 98-A." CFS and Chase Securities represented to Plaintiffs that they needed to create GREAT 98-A because servicing eleven separate SMARTs had become too unwieldy, cumbersome and inefficient.  CFS and Chase Securities also represented that many credit card obligors had multiple credit cards debts in various Trusts, which complicated compliance with the FDCPA. CFS and Chase Securities stated that aggregating all the credit card debt attributable to a single obligor in one master trust would eliminate this problem and improve efficiency.

119.   CFS and Chase Securities also designed the GREAT 98-A Master Trust so that CFS could add newly acquired credit card receivables over time.  CFS and Chase Securities told Plaintiffs that this would minimize the cost of creating and administering additional trusts while allowing CFS to continue to securitize additional credit card receivables.

120.   Defendants' undisclosed purpose in promoting the GREAT 98-A was to continue to conceal CFS' actual collection performance.  CFS had already liquidated the most collectible credit card receivables in the older SMARTs.  The GREAT was a potential way to use funds generated by new securitizations to pay off older securitizations.

121.   The GREAT 98-A closed on June 30, 1998 and issued approximately $736 million in notes, which Plaintiffs purchased for cash or by exchanging earlier acquired SMART notes for GREAT notes.  A second GREAT offering, GREAT 98-B, closed on September 30, 1998.  As they had in the SMART securities offerings, CFS and Chase Securities made representations in private placement memoranda, due diligence books and in other written


and oral communications about CFS' purportedly superior debt collection ability, its supposedly consistent history of successful debt collection and the ability of its model to provide reasonable predictions of expected debt collections.

122.    In selling the GREAT notes, CFS and Chase Securities did not make any disclosure about the pervasive problems with CFS' collections, its reliance on sham bulk credit card debt receivables to Dimat or the worthlessness of its collection model.

<u>The September 30, 1998 Anonymous Letter And Its Aftermath</u>

123.    On or about September 30, 1998, CFS' rating agencies received an anonymous letter stating in part that:

- Around 20% of all collections on the securitizations are coming from asset sales. In the last year, nearly all of them have been to a company called Dimat Inc. located in Shawnee Oklahoma. It was incorporated a few days before the initial purchase of receivables in September 1997. Why has no one in this industry ever heard of Dimat [?]. The company is paying 25-30 cents on the dollar. This is two or three times the market rate for regular receivables. Many of the sales occurred on the last day of the month and in an amount that just met the collection requirements of the securitization. In 1998, these sales have been of receivables that have an estimated cash recovery of zero. Why would a third party pay 30 cents for a 0% ECR asset? CFS continues to service these assets. If a third party purchased assets and continued to have the seller service these assets, wouldn't that company come and do a site visit? Dimat personnel have never toured the operation. Only the attorney for Dimat, James Sills ever contacts CFS. If a third party company purchased $60 million of charged off debt, why would they pay the same price for good assets in January and then skips in the summer? Why continue to pay three times the market rate when your total return is less than T-Bills? Why does CFS sell skips at 30 cents? Maybe due to the zero ECR of skips? Maybe restrictions on the percentage of asset sales based on ECR values. Why buy back securitizations as occurred in 1997 and why set up a master trust? Maybe the model works in the short run, but not the long term.

- About 70% of all set ups [converted accounts] are delinquent, but hardly any are ever defaulted. Why? They periodically become current over the weekend without payments ever being received. Interesting occurrence. Why does Jay Jones make modifications on the weekend, when no one is around? With a staff of 180 in IS, why does Jay come in to make changes by himself on the weekends?

- Why have senior managers left the company in the last year and a half reportedly with large severance packages? Why did CFS stop having management meetings when Dimat started buying receivables?

31

124.    On October 20, 1998, CFS issued a letter stating that CFS had engaged outside counsel to investigate the allegations and admitted that "there appears to be some basis for certain of the[ ] allegations" concerning the sales to Dimat.  In a conference call on October 27, 1998, CFS admitted to SMART and GREAT certificateholders that it had sold substantial amount of receivables from each of the SMART Trusts since January 1997.

125.    On October 27, 1998, Bartmann admitted that Jay Jones was involved with Dimat, the company that was purchasing the loans from CFS each month.

### CFS EXECUTIVE DEFENDANTS' PARTICIPATION IN THE FRAUD

126.    Brady and Bartmann worked closely with Bruce Hadden on all loan sales – in deciding the amounts of the sales and from which Trusts to sell.  Brady referred Hadden to Dimat as a possible purchaser of loans from the SMART securitizations.  Brady knew that Dimat had done no due diligence of CFS, had not asked for information concerning CFS' servicing of the receivables it had purchased, and that the documentation for the receivables sold to Dimat and serviced by CFS often was not even completed when Dimat paid for the purchases at the end of each month.

127.    Bartmann and Brady also communicated regularly with investors, including Plaintiffs, concerning the performance of the SMART securitizations, and made representations concerning CFS' past performance in collecting from the credit card obligors and concerning CFS' ability to collect sufficient revenue in the future to meet its projected "base" and "stress" case collections models.  In none of these communications, did Bartmann or Brady tell Plaintiffs that CFS was selling loans out of the Trusts in order to make its monthly numbers rather than collecting that money from the credit card obligors.  In none of these communications did Bartmann or Brady tell Plaintiffs that CFS was using revenue generated from recent

securitizations, which had been distributed as dividends to Bartmann and Jones, to buy tens of millions of dollars in loans securitized in older Trusts in order to make its monthly base and stress case numbers, or to make monthly payments of principal and interest to investors in those older SMART securitizations.

128.   Like Bartmann, Brady materially participated in CFS' sales presentations to investors, touting CFS' debt collection abilities.  Brady also sent false and misleading Monthly Statements to Plaintiffs and other investors, touting CFS' monthly collection performance.  But at all times Brady knew of the multitude of problems plaguing CFS' operations.  Brady also knew that CFS relied on credit card receivable sales both to make monthly principal and interest payments to investors and to lure investors into believing that collection results were in line with the standards established by the CFS collections model.  On July 31, 1997, for example, Brady received an e-mail from Hadden that stated:  "For those inquiring minds, year to date we've sold $18,367,376 in book value for a net recovery of $10,531,822 (including July sales).  This averages a little over $1.5 million in sales proceeds per month."  Further, from January 1997 on, Brady actively participated in structuring the credit card receivable sales, working with Hadden to determine which receivables to sell.

129.   Like Bartmann, Brady actively concealed CFS' bulk loan sales with the intent to defraud investors.  Brady sent the monthly reports to Plaintiffs and other noteholders that masked CFS' dependence on credit card receivable sales.  Further, Brady attended all the due diligence sessions held in Tulsa with Plaintiffs' investment advisors, and either stated herself, or allowed other CFS representatives to make misleading statements about CFS' debt collection practices, historical performance and predictive models.  Brady also participated with Bartmann in telephone conference calls and face-to-face meetings with Plaintiffs in April 1998 and May

1998, during which Brady attributed the drop in CFS' collections in March 1998 to operational difficulties.  In those telephone calls, Brady actively withheld from Plaintiffs and other investors the truth:  namely, that CFS' failure to consummate asset sales in March 1998 had caused the decrease in reported collections.

130.    On information and belief, Jones worked behind the scenes to conceal CFS' true collections performance and create the illusion that CFS' collection performance was in line with expectations.  Jones, who directly or indirectly owned, financed and controlled Dimat, facilitated CFS' sham loan sales transactions with Dimat.  Jones financed Dimat's loan purchases, personally and/or through Calamity Jones Entertainment, Inc. which he also owned and controlled, by contributing to Dimat approximately $14 million from the dividends on his CFS stock and the $50,750,000 Bartmann paid for shares of Jones' CFS stock.  Through this financing, Jones actively participated in and advanced the CFS scheme.

131.    Further, on information and belief, Jones manipulated CFS' computer records to show substantial numbers of loans as having been "converted" from "non-performing" to "performing" loans when in fact such loans were not "performing."  By manipulating the "conversions," Jones enabled CFS to conceal its true performance and prevented investors, including Plaintiffs, from knowing that a substantial number of obligors who were supposedly making monthly payments to CFS had in fact defaulted on their loans.

132.    Temple served as CFO of CFS from at least 1995 through mid-1998.  As CFO of CFS, Temple had ultimate responsibility for the financial statements and reports issued by the company.

133.    In its December 31, 1995 financial statements on January 19, 1996, CFS disclosed that it received $132 million in two securitizations conducted during 1995 and that, based on

"parameters used by the rating agency which rated" the two securitizations, CFS would receive an $850,000 residual payoff – an amount, termed the 'deferred sales price' – that CFS would receive after noteholders of the Trusts received complete repayment of principal and interest. The "parameters" used by the rating agencies came directly from CFS' model.

134.    But the assumptions underlying the model lacked any basis in fact.  Further, CFS' actual performance deviated materially from the model, thus undermining any reliance placed on the model to provide competent evidential matter to support the receivables and income an CFS' 1995 financial statements, and the collection of the credit card debt necessary to pay off the notes in the Trusts.  Even so, Temple allowed CFS to include these financial statements for the SMART 96-2 and SMART 96-4 private placement memoranda, thus misleading purchasers on these offerings.

135.    The recorded residual value and related income on CFS' 1996 financial statements grew exponentially in 1996.  On its year-end financial statements, CFS reported, again based on the estimation of value shown by its model, residual value in the credit card debt held by the Trusts of in excess of $50 million.  CFS only could obtain such value if it assumed collection of the $412 million, plus interest, on the credit card debt purchased by the SMARTs in 1995 and 1996.  Based on this assumption, CFS recognized more than $61 million in revenue (approximately 30% of reported 1996 revenue).

136.    CFS expressly stated that it relied on its collections model to record assets and income on its purportedly GAAP-compliant 1996 financial statements.  In the notes to these financial statements, CFS disclosed that it used "internally developed estimates to determine the expected collections on loans sold to the trust[s]," and consequently the value CFS assigned to the 'deferred sales price' asset recorded on its balance sheet.  CFS further stated in its financial

statements that estimates of expected collections depend on assumptions regarding CFS'

collection efforts like the ability to locate borrowers, negotiate acceptable lump sum payoffs or

extended payment terms, and the ability to resolve accounts based upon established terms. No

mention was made of asset sales. As also reported in the financial statements, CFS purportedly

evaluated the realizability of the receivables on a periodic basis throughout the year based upon

the actual collections to date, among other things.

137.   But CFS' actual performance data, which Temple was ultimately responsible for

reporting, showed that the model had no relation whatsoever to actual performance or CFS' true

ability to collect credit card debt. In fact, CFS did not have the debt collection expertise or the

reliable systems it touted to noteholders, and as a consequence, in January 1997 it began to sell

off in bulk substantial amounts of credit card debt to prop up the collection statistics it reported

to the noteholders. Further, such reliance on the model does not accord with the "going out of

business" analysis that Temple, on information and belief, prepared in early 1997.

138.   The significance of the values assigned to the CFS residual value as well as the

magnitude of revenue CFS recognized based on the assumption CFS would collect significantly

more than enough to pay off all the notes issued by the SMARTs, required Temple to examine

and test the model's ability to provide reasonable predictions of value. The substantial

obligations established by the Servicing Agreements further required Temple to know whether

CFS had complied with these agreements, and the debt collection performance standards

established. Temple knew, or was reckless in not knowing, that CFS' collection modeling

lacked any ability to supply the competent evidence required to record the assets and revenue on

CFS financial statements. Temple, by allowing CFS to include its December 31, 1996 financial

statements in the SMART 1997-2 through 1997-5 private placement memoranda, thus

knowingly, or recklessly, misled investors in these note offerings as to the value CFS reasonably could generate from the credit card debt purchased by such Trusts.

139.    In November 1997, CFS restated its 1996 financial statements.  Concluding that it had overestimated the residual value of the credit card debt, CFS reduced the recorded value of this asset by over $57 million.  According to the disclosures made in its financial statements, CFS made this adjustment because of a "lack of liquid secondary market" from which to judge value.  Even so, after the restatement CFS still assigned value to its residual interest based on "the low end of the range of fair values" generated by its model.  Use of such a value affirmed Plaintiffs' reasonable belief that CFS on behalf of the Trusts would collect more than enough from the credit card debt to pay all principal and interest on the notes held by the Plaintiffs.  All of these statements, however, were false and misleading.

140.    Although he now knew of the substantial problems with the model, in November 1997 Temple allowed CFS to issue restated 1996 financial statements.  In so doing, Temple knew, or was reckless in not knowing, that CFS' financial statements were materially false, and thus misled purchasers in SMART 1997-6 who received the SMART 1997-6 private placement memorandum containing these financial statements.

141.    Continuing his pattern of knowing or reckless misstatement, in February 1998 Temple allowed CFS to issue the CFS 1997 financial statements.  Once again these financial statements, relying on the CFS model, indicated that CFS would collect more than enough to pay off all principal and interest on the notes owned by the SMARTs, an amount now in excess of $1 billion.  As Temple knew or should have known, such statement was materially false and misleading.  Nothing in these financial statements indicated, as required under GAAP, that CFS

now relied on substantial bulk credit card receivable sales to related parties to meet the performance predicted by the model.

142.   Further, in its financial statements for 1997, CFS affirmatively stated that the compensation provided to CFS in the Servicing Agreements was sufficient to cover CFS' expected costs of collection such that CFS did not have to record a liability for such anticipated expenses.  As Temple knew or should have known at the time CFS issued these financial statements, such a statement was false because CFS needed, and had always needed, an infusion of cash from future securitizations to meet the spiraling costs of its inefficient and ineffective collection efforts.

143.   Temple knew, or was reckless in not knowing, of the above misstatements. Because Temple allowed CFS to include its December 31, 1997 financial statements in the private placement memoranda for the SMART 1998-1 and GREAT 1998-A and B, Plaintiffs and other investors purchasing notes in these offerings were misled.

144.   Kathryn Bartmann, with Bartmann and Jones, founded CFS in 1985.  Kathryn Bartmann also held the positions of chairwoman and CEO and, at all relevant times, was a member of CFS' board of directors.  Often quoted in the press, Kathryn Bartmann stated at various times that CFS' ability to provide excellent returns for noteholders came from the hard work of CFS' personnel, CFS' supposedly sophisticated and thorough credit card receivable review and organized, well-planned collection efforts.  CFS included such statements in the due diligence and other marketing materials distributed to potential investors.  Kathryn Bartmann also served on committees of the CFS board, and is a substantial shareholder of the company. Based on these positions, Kathryn Bartmann had the power and influence to prevent and correct the misrepresentations and omissions alleged in this Complaint.

## CHASE SECURITIES'
## PARTICIPATION IN THE FRAUDULENT SCHEME

145.    Beginning with SMART 97-2, Chase Securities was at the center of CFS' credit card securitizations, earning fees at each stage of the process.  Chase Securities' parent, the Chase Manhattan Bank, acted at CFS' primary bank lender, supplying CFS with a $100 million warehouse facility that enabled CFS to purchase the credit card receivables it later sold to the Trusts.  Chase Manhattan Bank also made millions of additional dollars through CFS' securitizations as one of CFS' largest suppliers of credit card receivables.  Chase Manhattan Bank was also guaranteed a price for its charged-off credit card receivables equal to or exceeding the price CFS paid any other institution for similar receivables.  Because it 'brokered' CFS' purchase of the Chase Manhattan Bank credit card receivables, Chase Securities received a commission on these purchases of credit card receivables.  Chase Securities also made millions of additional dollars as the Placement Agent for the securities sold in the SMART 97-2 through SMART 97-4 securitizations and as initial purchaser and underwriter for SMART 97-5 through SMART 98-1 and for GREAT 98-A.

146.    Acting primarily through Mike Zarilli, the Chase Securities managing director responsible for the CFS account, Chase Securities directed and participated in the management of CFS' business and in the control of the CFS securitization process.  Specifically, Chase Securities controlled or participated in CFS' decisions on deploying assets, hiring personnel, making strategic growth decisions and communicating with potential and existing investors in the notes sold by the CFS Trusts.  Chase Securities became the primary information conduit between CFS and Plaintiffs, and consistently misled Plaintiffs about the material problems with CFS' debt collection and modeling.

39

<u>Chase Securities Becomes CFS' Placement Agent</u>

147.    In late 1996, through an introduction provided by counsel for Bartmann and CFS, Bartmann met with Mike Zarilli of Chase Securities.

148.    Zarilli quickly inserted himself into the management structure at CFS.  Zarilli had daily contact with Bartmann, and participated in substantially all key decisions, including those involving personnel, asset deployment and the decision to expand the securitization process.  For example, Zarilli interviewed Mitchell Vernick before he was offered the job as Chief Executive Officer of CFS.  Zarilli also had final say over what information CFS disclosed to noteholders and potential noteholders.

149.    Chase Securities had access to and knew internal CFS information beyond that available to investors.  Zarilli and others at Chase Securities told investors that Chase Securities had done extensive due diligence on CFS.  Chase Securities had the ability to judge the reasonableness of the CFS collection model by examining in detail the assumptions underlying this model, and to determine if CFS had the appropriate personnel, systems and operating strategy to sell itself as a superior credit-card receivable collector that noteholders could reasonably expect to generate credit card collections sufficient to pay off the notes issued by the Trusts.

150.    Chase Securities had a duty to conduct due diligence on behalf of the noteholders who purchased in these offerings.  Beginning with SMART 97-5, Chase Securities also served as an underwriter of the securities and marketmaker, and told investors, including certain Plaintiffs, that the securities issued by these Trusts had the additional credit enhancement of Chase Securities standing behind the offerings.

151.    Chase Securities' due diligence obligations, at a minimum, required it to test the assumptions underlying CFS' collection modeling, to gain an understanding of CFS' debt collection capabilities, to determine the reasonableness of CFS' valuation of the credit card receivables sold to the Trusts and to determine if, in fact, CFS was the superior credit card receivable collector it claimed to be.  Chase Securities also had an obligation to investigate any indication that CFS was having serious operational problems or that its collection modeling was not what it was represented to be.

152.    Chase Securities' due diligence obligations also required it to compare CFS' actual collections to CFS' modeling, including Base Case and Stress Case for prior securitizations.

153.    Chase Securities also had an obligation to test the accuracy and reasonableness of Base Case and Stress Case modeling it sent to Plaintiffs and other prospective investors.

154.    Chase Securities withheld information that undermined the CFS collection model and the claims of CFS' superior debt collection abilities.

155.    For instance, Chase Securities knew that actual collection results did not correlate in any way with the performance expectations of the model.  In fact, Vernick told Zarilli of his concerns in this regard soon after Vernick started at CFS in February 1997.  Zarilli also knew that in January 1997 CFS began to sell credit card receivables in bulk from the Trusts as means of meeting the model's base case measures.

156.    But instead of fully reporting on these structural problems, Chase Securities continued to sell CFS as a superior debt collector and the model as a reasonable means of predicting credit card debt collections.  Chase Securities did this by distributing the false and misleading CFS private placement memoranda, by providing noteholders and potential investors

with performance statistics that masked CFS' reliance on bulk credit card receivable sales, and through oral representations made at due diligence sessions in Tulsa, the Super Bowl 'seminars' in 1997 and 1998 and in one-on-one sales presentations with Plaintiffs and other potential note purchasers.  In addition, Chase Securities sent prospective investors tables and charts predicting CFS' collections on offered securitizations that Chase Securities knew, or recklessly did not know, had no basis in CFS' actual historical performance.

157.    The explanation Chase Securities offered through Zarilli of the reasons for Vernick's resignation was typical of its purposeful effort to mislead investors.  In a conference call with investors in or about June 1997, Bartmann, Zarilli and Brady explained that Vernick's resignation was due to "philosophical differences" between Vernick and Bartmann, and that Zarilli had learned nothing that would cause Chase Securities to end its association with CFS.

158.    CFS had reported a marked drop in March 1997 collections for the then-outstanding SMART securitizations.  In conversations with noteholders, Bartmann and Zarilli attributed the drop in collections to non-recurring operational issues at CFS related, in part, to Vernick's resignation.

159.    In fact, Bartmann had asked Vernick to resign or be fired because Vernick would not continue to participate in securities offerings that touted the CFS collection model that Vernick, after reviewing CFS' actual performance, believed had no predictive ability.  Indeed, Vernick stated that he believed it was unlikely that CFS would collect sufficient amounts from the credit card receivables in the Trusts to pay off the notes.  Further, the decline in March 1997 "collections" was a result of CFS' failure to make a bulk credit card receivable sale, a fact Zarilli knew but did not disclose.

160.    In or about June or July 1997, Chase Securities also received a report from international accounting firm KMPG Peat Marwick, setting forth the results of agreed upon procedures performed at CFS.  In this report, KPMG disclosed that for nine of the twenty checks KMPG included in its sample, CFS did not deposit the funds received in the related Trust collection accounts because CFS had sold the related loans prior to receiving the payment.

161.    That almost half of the checks received by CFS in the KPMG sample were attributable to credit card loans CFS sold to third parties, at a minimum, called into question whether CFS was complying with the covenants in the Servicing Agreements restricting asset sales to $5 million in aggregate ECR Payoff Balances at a price of no less than 75% of the aggregate ECR Payoff Balance.  Indeed, in December 1998, CFS admitted that it had exceeded the $5 million sale limitation on asset sales out of SMART 96-3 and SMART 96-4.

162.    The pervasive asset sales across the SMART securitizations, which were necessary to keep the securitizations afloat, also undercut the picture of CFS as a premier loan collector painted by Chase Securities and the other Defendants in their communications with investors.  Further, because it continued to service the loans it sold to Dimat, CFS breached its commitment to conduct servicing only for the Trusts, another practice Chase Securities knew, or should have known, but did not disclose to Plaintiffs and other investors.  The due diligence books for certain of the securitizations that closed after the bulk credit card receivable sales to Dimat began, state that CFS "buy[s] as a Principal – no servicing for third parties."

163.    In March 1998, when CFS did not make the sales to Dimat that it had come to depend on to meet its collection projections, Chase Securities once again misled noteholders about the true reasons behind the resulting dip in CFS reported results.  In response to questions raised by investors about CFS' March 1998 performance, Zarilli stood shoulder to shoulder with

Bartmann in providing the false explanation that the drop in collections resulted from temporary operational issues – such as disruptions resulting from staffing changes and glitches with the CFS predictive dialers phone system – rather than the actual reason for the performance dip, i.e., the absence of loan sales and the fundamental problems with the collectability of the credit card receivables.  CFS, in an April 8, 1998 letter drafted by Zarilli, confirmed the false oral explanations given to investors, informing such investors that if they had any further questions, they could contact Zarilli or any member of the "Chase team."  In discussions with Plaintiffs on April 20, 1998 and in May 1998, Bartmann, Brady and Zarilli again cited operational difficulties as the explanation for the March 1998 shortfall.

164.    Chase Securities also sent charts and graphs to Plaintiffs that purported to show CFS' collections performance on outstanding SMART transactions.  For example, in July 1997, in connection with efforts to sell securities in the SMART 97-4 transaction, Terri Pierle of Chase Securities sent a set of graphs, on Chase Securities' stationery, to certain Plaintiffs and other potential investors purporting to show that CFS' collections for the SMART 96-4, SMART 97-1, SMART 97-2 and SMART 97-3 Trusts exceeded the "base case" projections.  In September 1997, in connection with efforts to sell securities in the SMART 97-5 transaction, Hardy Viener of Chase Securities sent certain Plaintiffs and other potential investors a series of charts, on Chase Securities' stationery, purporting to show that CFS' collections for the SMART 96-2 through SMART 97-4 Trusts exceeded base case predictions.

165.    Chase Securities repeated these and other misrepresentations and omissions in numerous communications it had with Plaintiffs and other investors during its tenure as CFS' investment banker.  During that time period, Chase Securities had dozens of meetings as well as oral and written communications with investors relating to the SMART 97-2, 97-3, 97-4, 97-5,

97-6, 98-1, and GREAT 98-A securitizations. In its communications with Plaintiffs during this time period, Chase Securities, knowingly or in reckless disregard of the truth, made the following materially misleading statements and omissions:

a) Chase Securities distributed to investors private placement memoranda, due diligence binders and other written materials that misrepresented and overstated the ECR for the credit card receivables being securitized in the various Trusts because the ECR figures did not account for the fact that CFS' data base was incomplete and inadequate to allow CFS account officers to collect the loans from the credit card obligors.

b) Chase Securities distributed to investors private placement memoranda, due diligence binders and other written materials that misrepresented and overstated the ECR for the credit card receivables being securitized in the various Trusts because CFS intended to and did sell credit card receivables at the end of each month in order to raise cash needed to pay the principal and interest on the securities.

c) Chase Securities distributed to investors private placement memoranda, due diligence binders and other written materials that misrepresented that CFS believed it could collect sufficient cash from the obligors on the credit card receivables in order to make the monthly principal and interest payments on the securities issued by the trusts when, in fact, Chase Securities knew that CFS could not make the monthly debt service on the securities without selling credit card receivables in the Trusts.

d) Chase Securities distributed to investors due diligence binders for SMART 97-5, 97-6, and 98-1 that contained a statement in the section titled "CFS Overview" that CFS "Buy[s] as Principal – no servicing for third parties" when, in fact, CFS had agreed to service the credit card receivables it sold to Dimat.

e) Chase Securities knew that the monthly collections reports issued to investors by CFS were materially misleading in that they reported the proceeds of sales of credit card receivables during the month in a catch-all category called "collections" which gave the misleading impression that the funds were collected from the obligors on the credit card receivables when in fact a significant percentage of the collections were attributable to sales of credit card receivables.

f) Chase Securities knew that the monthly collections reports issued to investors by CFS were materially misleading in that a significant percentage of the non-performing credit card receivables that were reported as having been converted to performing credit card receivables were, in fact, in default.

g) Chase Securities omitted to state that all of the sales of credit card receivables between September 1997 and September 1998 were to Dimat, a corporation that was directly or indirectly affiliated with CFS through Jones, and that Dimat was funding its purchases from CFS with the proceeds of dividends Jones received on his CFS stock and from the sales of shares of that stock to Bartmann.

### Chase Securities' Exit Strategy

166.     By Spring of 1998, Chase Securities knew CFS had to do something to address the growing problems CFS faced administering Trusts.  It was becoming harder to hide the deficiencies in the data base, the problems associated with contacting obligors who had multiple credit card receivables in multiple trusts, and the fact that CFS had to sell credit card receivables out of the Trusts to related parties at more than their fair market value in order to make monthly principal and interest payments on the securities issued by the Trusts.  Therefore, with Chase Securities' assistance, CFS attempted to convince investors to exchange their SMART securities for the GREAT securities.  If so converted, CFS could attempt to continue hiding its poor performance in collecting the credit card receivables owned by the older Trusts, and continue the securitization Ponzi.  But Chase Securities had only limited success convincing investors holding SMART securities to exchange those securities for GREAT securities.

167.     At the same time that Chase Securities was attempting to convince investors to exchange their SMART securities for GREAT securities, Chase Securities' parent still had exposure to CFS because of the $100 million warehouse line of credit Chase Manhattan Bank provided CFS.  Upon information and belief, the May 20, 1998 downgrade by Moody's Investors Service of its ratings on SMART 96-3, SMART 96-4 and SMART 97-1 constituted an event of default under the CFS warehouse line of credit with Chase Manhattan Bank.  At the time, however, CFS owed Chase Manhattan Bank more than $50 million on the warehouse line of credit.  Accordingly, Chase Manhattan Bank did not call this default until at or about the time

of the closing of GREAT 98-A in or about late June or early July 1998 and after the warehouse line had been paid down with the proceeds of that securitization. Chase Securities also withheld disclosure of CFS' default from investors it solicited in connection with the GREAT 98-A securitization.

168.   In August 1998, after the GREAT 98-A closing, Chase Securities sent CFS a list of questions as part of a purported "Due Diligence Agenda." In that document, Chase Securities admits that CFS and Chase Securities had been providing investors with misleading information concerning the ECR for both the existing and new SMART and GREAT securitizations, stating:

> Chase is confused because Chase understands CFS to be making what Chase believes may be simultaneous conflicting statements: (i) that CFS expects to collect every dollar it originally expected to collect for each remaining SMART securitization; and (ii) CFS now expects each remaining SMART securitization to collect on a 140% curve (either seasoned individually or all CFS assets rolled-up seasoned or otherwise). It is only possible to partially reconcile these statements by assuming a significantly stretched curve (although this does not speak to aggregate dollars).

> While Chase understood that investors were told remaining SMART transactions might have more volatile flows, possibly affecting average life an ratings, Chase did not believe that investors were told to expect less collections or volatility around a different curve.

169.   The "Due Diligence Agenda" also contains the following "questions" from Chase Securities:

- Did Mike [Temple, the CFS chief financial officer who resigned in July 1998] ever indicate discomfort with CFS' models, projections, assumptions, results, servicing cost analysis or financial reporting? If yes, what aspect and why?

- What are the terms of his separation (re: severance, confidentiality, non-compete, etc.)?

- How can Investors be comfortable that CFS is servicing each transaction fairly and not underallocating resources to a given transaction?

- What information does CFS review on a daily, weekly and monthly basis to monitor portfolio performance? Would CFS review such data with Chase on a one-off basis at this time?

- As previously discussed, collection performance generally was down in March 1998 when compared to monthly base case, and was particularly down for some of the older SMART transactions. However, collection performance was markedly improved during April and May. Please describe the special means used, if any, to reach monthly Base Case cash flow projections on the older SMART transactions during April and May.

- What were the specific assumptions incorporated into the new 140% ECR collections curve?

- Please describe in as much detail as possible the basis for such assumptions.

- We understand that one of the rationales for this curve was to incorporate into the Master Trust lower expectations of collections, which would allow a lower base case hurdle (as well as reduce the likelihood of triggering a Servicer Default). Does this remain true, or does the curve for new assets represent CFS' actual expectation of collections on all assets?

- If CFS believes collections, at least in amount or timing and opposed to volatility around original timing, for any existing SMART transactions will not be as originally modeled, does CFS intend on communicating this to the relevant investors? If communications are intended, what does CFS intend to say?

170.    If Chase Securities did not know the answers to these and other questions in the "Due Diligence Agenda," having just closed the GREAT 98-A securitization in which it solicited Plaintiffs and others to purchase new securities and to exchange their existing SMART securities for GREAT securities, then Chase Securities was deliberately reckless in not having that information and in failing to disclose to Plaintiffs that it did not have that information.

<u>PLAINTIFFS' RELIANCE</u>

171.    Each of the Plaintiffs was unaware, among other things, that:

- CFS was selling substantial amounts of receivables from the SMARTs;

- CFS needed to sell receivables from the SMARTs in order to make monthly principal and interest payments to investors;

- actual monthly collections from credit card obligors for the SMARTs were substantially different than expected "base case" collections;

- CFS' collections modeling did not generate numbers that comported with CFS' historical collections experience;

- CFS' operations were in disarray;

- CFS regularly closed its loan sales on the last day of the month in the amount it needed to makes its collection target or goal for the month;

- an important and necessary component of CFS' collection operation was the ongoing sale of loans;

- CFS had exceeded the allowable limits on loan sales from certain trusts;

- CFS was selling loans to an entity that was affiliated with one of its shareholders and directors and that was being funded with the proceeds of CFS' securitizations;

- although the "strong" ranking that CFS had received from Standard & Poor's in January 1997 and the "approved servicer" designation it had received from Duff & Phelps in February 1997 continued to be cited in the private placement memoranda and due diligence materials that were used to sell the securities, the facts contained in those rating agency reports and upon which they were based were not accurate;

- substantial numbers of obligors had defaulted on accounts reported by CFS as "converted" and "performing" accounts;

- Vernick had resigned because of concerns over some of these undisclosed facts.

Had Plaintiffs been informed of any of the foregoing facts before entering into any SMART or GREAT transaction, they would not have entered into such transaction. Additionally, to the extent they had already invested, Plaintiffs would have attempted to sell their securities, if a buyer existed, or to replace CFS with the back-up servicer.

### The AEGON Plaintiffs

AEGON's and Providian's Investment in SMART 97-2
in Reliance upon Defendant's Fraudulent Statements and Omissions

172.    In or about late January or early February 1997, David Schiff and Andy Dym of Chase Securities telephoned Providian's Robert Smedley and Frederick Howard about the

SMART 97-2 note offering.  Throughout February and early March 1997, Chase Securities and

Providian personnel had dozens of communications concerning SMART 97-2 and CFS.  In the

course of those communications, Chase Securities made scores of statements touting, among

other things, the purported strengths of CFS' management and personnel, CFS' collection

approach and operations, its model for predicting collections from a portfolio of credit card

receivables, CFS' historic collections performance and the "conservatism" built into CFS' Base

Case and Stress Case cash flow models.  For example:

- In an initial phone call with Providian, Dym and Schiff stated, among other things, that CFS used its proprietary ECR Model to estimate the amount it would collect from a given loan portfolio, and that CFS' experience up until January 1997 was that it had collected significantly in excess of its ECR predictions.  Dym and Schiff also described CFS' cash flow modeling and its collection methods, stating that CFS focused on converting individual credit card debts to installment loans, and that, over 24 months, CFS converted approximately 20% of the loans in a portfolio to installment loans, and that approximately 80% were settled.  Smedley and Howard asked Chase to provide a great deal of information, including information relating to the Agreed-upon Procedures to be performed by CFS' auditors, Arthur Andersen LLP, CFS' most recent financial statements and other detailed information, including initial ECR and performance statistics for earlier SMART Transactions and the identifications of events of default that would trigger investors' right to replace CFS with the designated backup servicer.

- On or about February 10, Chase Securities provided Providian with an "information package" consisting of materials relating to the SMART 97-2 Transaction.  Chase's accompanying cover letter stated in part that the materials included "historical information on the performance of prior securitizations."  The purported historical information represented that CFS' collections on outstanding securitizations met or exceeded Base Case predictions on each prior securitization.

- On or about February 24, 1997, and again on or about March 3, 1997, Chase Securities sent Providian a set of tables purportedly prepared by Chase Securities, including tables showing predictions of the amounts CFS would collect on the SMART 97-2 loan portfolio under the Base and Stress Cases.

- In or about February 1997, Chase Securities sent Providian a copy of CFS' manual setting forth CFS' Credit and Collections Policies and Procedures.  The manual lacks any mention of loan sales among the credit card collection procedures.

- In or about February 1997, Chase stated to Providian that a key to understanding the SMART 97-2 Transaction was to examine CFS' Due Diligence Book and to review the book in detail with Chase.

173.    Providian also spoke to Bartmann and Brady before deciding to purchase SMART

97-2 Certificates on behalf of Providian Life and Health Insurance Company.  On February 20

and 21, 1997, for example, Smedley and Howard participated in "Due Diligence" meetings with

CFS and Chase Securities at CFS' offices in Tulsa.  Smedley and Howard met with Schiff and

the CFS executives, including Bartmann and Brady.  Bartmann spoke at length about CFS and

the securitizations, describing, among other things, the financial position of the company, the

ECR Model, CFS' purported historical collections performance and the Base Case and Stress

Case cash flow models.

174.    On or about January 30, 1997, Chase Securities telephoned AEGON analyst John

Bailey to solicit AEGON's participation in notes to be issued in the SMART 97-2 Transaction.

Beginning with the January 30 telephone call, and throughout February and early March 1997,

Chase Securities and AEGON had dozens of communications concerning SMART 97-2 and

CFS.  In the course of those communications, Chase Securities made scores of statements

touting, among other things, the purported strengths of CFS' management and personnel, its

collection approach and operations, its model for predicting collections from a portfolio of credit

card receivables, the "conservatism" built into CFS' Base Case and Stress Case cash flow

models for the SMART 97-2 Transaction, CFS' past collections performance and the structure

and risks of the SMART 97-2 Transaction.

175.    In addition, in or about February 1997, Bailey visited CFS' offices in Tulsa,

where he met with Zarilli, Schiff and Pierle of Chase Securities as well as CFS executives,

including Bartmann and Brady.  CFS and Chase Securities provided Bailey with a Due Diligence

Book relating to the SMART 97-2 Transaction.  Bartmann spoke at length about CFS and the securitizations, describing, among other things, the financial position of the company, the ECR Model, CFS' purported historical collections performance and the Base Case and Stress Case cash flow models.  Bartmann stated that CFS' historical collections were 112% of ECR.  When Bailey asked to see the ECR Model, Bartmann unrolled a detailed flow chart diagram approximately 20 or 30 feet long and stated that the details of the model consisted of proprietary information that could not be shown in detail to prospective investors.  Bartmann further stated that the rating agencies had signed off on the model.  Chase Securities representatives participated in all of Bailey's meetings with CFS officials and his tour of the facility.

176.    Providian Life and Health Insurance Company, through its agent Providian, and AUSA Life Insurance Company, Inc. Life Investors Insurance Company of America and PFL Life Insurance Company, through their agent AEGON, collectively purchased $37 million in SMART 97-2 Notes.  These purchases were made in reliance upon, among other things:

- the representations by defendants described above;

- representations made in the Due Diligence Book for SMART 1997-2;

- representations made in the PPM for SMART 1997-2;

- representations by Defendants that CFS had developed an extensive and proprietary model to evaluate portfolios of credit card receivables that estimated expected cash flows based upon its past experience;

- representations by Defendants that the Base Case and Stress Case cash flow models were "conservative" given CFS' actual historical collections experience;

- representations by Defendants that CFS had developed a proven collection process that had provided excellent returns;

- representations by Defendants that, as of March 1997, CFS was collecting 112% of its original Estimated Cash Recovery on outstanding securitizations;

- representations by Defendants that the total amount of securities issued by the SMART 97-2 was based upon an assumption that CFS would collect at least 90% of the ECR to add conservatism to the investment;

- representations by Defendants that the default rate on converted loans in outstanding securitizations had averaged approximately 12% on an annualized basis, and that the actual conversion of receivables to performing loans was ahead of the levels predicted in the Base Case model;

- representations by Defendants that the SMART 1997-2 Certificates were "overcollateralized," having an ECR of $221 million, an amount equal to 147% of the Certificate balance;

- representations by Defendants that the ratio of total debt issued by SMART 97-2 to the total amount of receivables it held, 13.2%, would provide substantial protection against loss in the portfolio before SMART 97-2 Certificates would be impaired;

- representations by Defendants that even under the Stress Case, which assumed significant deterioration in the collectability of the receivables, certificates would be repaid in full;

- representations by Defendants that CFS account officers would take steps to ensure that credit card obligors honored payment plans arranged with CFS, including contacting the obligors immediately after an agreed-upon payment went unpaid;

- representations by Defendants that the SMART 97-2 Transaction included adequate default "triggers" that would provide Certificateholders the option to replace CFS as Servicer if, after February 28, 1998, the annual default rate on performing and converted loans exceeded 23% or if, after July 31, 1997, actual cash collections did not exceed 70% of the cumulative expected collections;

- representations by Defendants that CFS would place in "escrow" a substantial portion of the proceeds from the securitization to be used to pay future tax liabilities resulting from the substantial collections CFS expected to make after paying bondholders;

- representations by Defendants that CFS had invested heavily in its employees and technology and information systems, and had a fully automated operation;

- CFS' audited financial statements for 1996 and 1995.

AEGON's Participation in SMART 97-4
in Reliance upon Defendants' Fraudulent Statements and Omissions

177.    In or about July 1997, Chase Securities telephoned Robert Smedley and Frederick Howard offering to sell securities issued in the SMART 97-4 Transaction. During July 1997,

Chase Securities, through Jamie Egbert, Terri Pierle, Peter Candell and others, had several

communications with Smedley and Howard concerning the SMART 97-4 Transaction and CFS.

For example:

- On or about July 9, 1997, Chase Securities sent AEGON a Due Diligence Book relating to the SMART 97-4 Transaction. The accompanying cover letter, on Chase Manhattan Bank stationery, stated in part: "Dear Prospective Investor: Enclosed is supplemental information to the CF/SPC SMART 1997-4 Private Placement Memorandum." The letter further stated, in part: "The information contained herein has been prepared solely to assist the recipient in making their own evaluation of the proposed transaction . . ." and directed prospective investors to contact Chase Securities with any questions.

- Between July 18, 1997 and August 4, 1997, Chase Securities sent AEGON numerous tables, charts and analyses purportedly prepared by Chase Securities and relating to the SMART 97-4 Transaction. The tables included statistics for the expected "Gross Collections" and for "Expected Collections Available for Debt Service" under the Base Case and Stress Case models. Chase also provided statistics for the "Investor Principal Shortfall" and "Investor Interest Shortfall" under the Base and Stress Case models, and reported that statistic as zero under either scenario.

- On July 23, 1997, Egbert, Pierle and Candell spoke by telephone with Smedley and Howard in response to a list of questions submitted by AEGON, purporting to explain, among other things, the derivation of the ECR calculations for the SMART 97-4 Transaction and of the "expected gross collections" statistics under the Base Case.

178.   Providian and AEGON, on behalf of Commonwealth Life Insurance Company

and PFL Life Insurance Company, respectively, purchased approximately $10.9 million in

SMART 97-4 Certificates in reliance upon, among other statements and omissions, each of the

representations on which each of the AEGON Plaintiffs relied in making the purchases the

SMART 97-2 notes. In addition, AEGON relied upon, among other things,

- the additional representations by Defendants described above;

- representations made in the Due Diligence Book for SMART 1997-4;

- representations made in the PPM for SMART 1997-4;

- representations by Bartmann and Zarilli, made in the conference call placed by Zarilli and Bartmann on or about June 4, 1997, concerning the reasons Mitchell Vernick had resigned from CFS and the reasons CFS' collections declined during March 1997;

- performance statistics reported in CFS' Monthly Statements sent to Providian and AEGON USA Investment Management, Inc.;

- representations by defendants that the SMART 97-4 Certificates were overcollateralized, having an expected net cash flow collection of approximately $349 million under the Base Case and approximately $229 million under the Stress Case, amounts equal to approximately 198% and 130%, respectively, of the original balance of the notes;

- representations by defendants that CFS could be removed as Servicer if, among other things, after June 30, 1998, the annual default rate on performing and converted loans exceeded 23%;

- CFS' financial statement as of March 30, 1997, including its reported total assets and total equity, and its reported net income and total revenues for the first quarter of 1997;

### AEGON's Participation in SMART 97-6
### in Reliance upon Defendant's Fraudulent Statements and Omissions

179.    On or about September 15, 1997, Chase Securities telephoned Greg Podhajsky of

AEGON, offering to sell securities issued in the SMART 97-6 Transaction.  From September 15,

1997 through early December 1997, Chase Securities, through Jamie Egbert, Terri Pierle and

Peter Candell, had several communications with Podhajsky and Smedley concerning the

SMART 97-6 Transaction and CFS.  For example:

- In a telephone call on or about September 15, 1997, Pierle stated, among other things, that the expected cash collections for the SMART 97-6 Trust were $486 million.

- On or about October 20 and 21, 1997, Robert Smedley and Greg Podhajsky attended a due diligence meeting hosted by CFS at its Tulsa offices.  Smedley and Podhajsky met with Zarilli and Pierle, as well as Bartmann, Brady and other CFS executives, and were provided with a Due Diligence Book relating to the SMART 97-6 Transaction.

- On or about November 7, 1997, and again on December 4 and December 8, 1997, Chase Securities sent AEGON sets of tables purportedly prepared by Chase Securities relating to the SMART 97-6 Transaction.  The tables included statistics for the expected "Gross Collections" and for "Expected Collections Available for Debt

Service" under the Base Case and Stress Case models. Chase also provided statistics for the "Investor Principal Shortfall" and "Investor Interest Shortfall" under the Base and Stress Case models, and reported that statistic was zero under either scenario.

- On or about November 19, 1997, Pierle and Egbert sent AEGON a Due Diligence Book relating to the SMART 97-6 Transaction, accompanied by a cover letter on Chase Securities stationery, stating in part: "Dear Prospective Investor: Enclosed is supplemental information to the CF/SPC SMART 1997-6 Private Placement Memorandum." The letter further stated, in part: "The information contained herein has been prepared solely to assist the recipient in making their own evaluation of the proposed transaction . . ." and directed prospective investors to contact Egbert or Pierle with any questions.

- On or about November 20, 1997, Podhajsky participated in a conference call in which Bartmann announced that CFS was writing down its residual interest in the SMART Trust portfolios from $58 million to zero. Podhajsky and other investors were told that the reason for the writedown was the absence of independent data to validate the value CFS ascribed to the residual interest, and that Arthur Andersen LLP required such evidence before it would certify CFS' financial statements.

- In a telephone conversation with Podhajsky on or about November 26, 1997, Egbert and Schiff stated that although CFS had written down the value of CFS' residual interests, that such writedown was "purely an accounting issue." Egbert and Schiff stated that the reason for the writedown was that Arthur Andersen wanted a third party valuation to support the value ascribed by CFS, and because no such valuation was available, CFS took the "conservative approach" of writing down the residual value. Egbert and Schiff further stated that CFS still believed the residual value equaled the amount predicted under the Base Case assumptions for each securitization, and that CFS still expected to realize those amounts as income. Egbert and Schiff further stated that Chase Securities had performed a significant degree of due diligence, and that AEGON had no reason to be concerned about the writedown.

- On or about December 2, 1997, Chase Securities sent AEGON tables purporting to show, by month for each prior CFS credit card securitization, that payments to certificateholders met or exceeded Base Case on a cumulative basis.

180.   AEGON, on behalf of Bankers United Life Assurance Company and Peoples Security Life Insurance Company, collectively purchased $14,000,000 in SMART 97-6 Certificates in reliance upon, among other statements and omissions, each of the representations and omissions on which AEGON relied in making the purchases the SMART 97-4 certificates. In addition, they relied upon, among other things,

- the representations by Defendants described above;

- representations made in the Due Diligence Book for SMART 1997-6;

- representations made in the PPM for SMART 1997-6;

- additional tables, charts and graphs provided by Chase Securities and CFS purporting to show that each previous CFS securitization was performing above the Base Case collection scenarios, including Monthly Statements sent to AEGON in connection with its participation in earlier SMART Transactions;

- statistics for the cumulative cash flow received for each of the SMART 96-2 through SMART 97-4 Transactions, which reportedly ranged from 102% to 135% of the Base Case predictions, and 118% to 147% of the Stress Case predictions;

- representations by Defendants that the SMART 97-6 Certificates were overcollateralized, with an expected net cash flow of approximately $476 million under the Base Case and approximately $293 million under the Stress Case, amounts equal to approximately 216% and 133%, respectively, of the original balance of the notes;

- representations by Defendants that the Base Case was conservative in light of CFS' actual historical rates of collections and because it assumed an annual net default rate for the converted loans of 12% and reported actual annual net default rates were 7%;

- representations by Defendants that there was a significant "cushion" for a deterioration in collection performance built into the transaction, given that performance would have to fall below Stress Case before certificateholders would be affected;

- representations by Defendants that the SMART 97-6 Transaction was conservatively structured to provide adequate triggers in the form of Servicer Events of Default that would provide Certificateholders the option to replace CFS as Servicer if, among other events, the annual default rate on performing and converted loans exceeded 23% after June 30, 1998;

- CFS' financial statement as of September 30, 1997, including its reported total assets and total equity, and its reported net income and total revenues for the first three quarters of 1997.

### AEGON's Participation in GREAT 1998-A
### in Reliance upon Defendants' Fraudulent Statements and Omissions

181.     On May 28, 1998, Podhajsky met in Chicago with Bartmann, Brady, Zarilli,

Viener and Hourican, where CFS and Chase Securities solicited AEGON USA Investment

Management, Inc. to participate in a transaction on behalf of its affiliates under which

receivables held in the SMART Trusts would be transferred to a master trust, and investors would exchange their SMART Certificates for certificates issued by the new, master trust. CFS and Chase stated at the meeting that the master trust would be advantageous to investors because a single, master trust would provide diversification in the form of a larger asset pool, would enable CFS to collect more efficiently, and would eliminate legal restrictions on CFS' ability to collect from the substantial numbers of individual obligors liable for receivables in two or more SMART Trusts.

182.    In June 1998, AEGON, on behalf of Commonwealth Life Insurance Company and PFL Life Insurance Company, exchanged their SMART 97-4 notes for notes issued by GREAT 98-A in reliance upon, among other statements and omissions, each of the representations and omissions on which AEGON relied in purchasing the SMART certificates. In addition, Commonwealth Life Insurance Company and PFL Life Insurance Company participated in the exchange in reliance upon, among other things:

- the representations by Defendants described above'

- representations made in the Due Diligence Book for GREAT 1998-A;

- representations made in the PPM for GREAT 1998-A;

- CFS' financial statement as of December 31, 1997, including its reported total assets and total equity, and its reported net income and total revenues for 1997;

- representations made in the April 8, 1998 letter purporting to explain the March 1998 decline in collections;

- representations made by Zarilli during an April 13, 1998 conference call and similar statements made by Chase Securities during the May 28, 1998 meeting in Chicago that the reasons for the declines in CFS' collections during March 1998 were related to Bartmann's vacation and the CFS managers' failure to make "adjustments" to make sure securitizations performed well and met Base Case during the month, and a shift away from using auto-dialers, and a change in the shifts of certain collections employees and problems with the Fair Debt Collections Practices Act.

## The BlackRock Plaintiffs

BlackRock's Reliance on Defendants' Fraudulent Statements and Omissions

183.    In or about February 1997, Jack Fields of Chase Securities telephoned Michael

Lustig of BlackRock soliciting BlackRock's participation in the SMART 97-2 Transaction.

Fields and Lustig had several conversations about CFS and the SMART securitizations during

February 1997.  In the course of those conversations, Fields made numerous statements touting

the purported strengths of CFS' management and personnel, CFS' collection approach and

operations, its model for predicting collections from a portfolio of credit card receivables, CFS'

past collections performance and the conservatism built into CFS' Base Case and Stress Case

cash flow models.  Fields also told Lustig that SMART 97-2 Certificates were unlikely to go into

default because the transaction was structured to provide a significant "cash cushion" between

the amounts CFS was expected to collect on the receivables that secured the bonds and the

collections needed to repay the bonds.

184.    In or about February 1997, Chase also provided BlackRock with CFS due

diligence materials relating to SMART 97-2, which included CFS financial statements,

information on CFS' organization and management, and tables and graphs purporting to show

that CFS' collections and repayment of notes on all prior securitizations met or exceeded Base

Case.  Chase also provided BlackRock with various cashflow projections showing expected

collections under the Base and Stress Case.

185.    In or about February 1997, Rob Kauffman of BlackRock made a due diligence

visit to CFS' offices in Tulsa, where he met with David Schiff of Chase Securities.  During the

due diligence visit, Schiff described the history of CFS' prior securitizations and said that CFS

had Chase Securities' "seal of approval."  Bartmann and other CFS executives also spoke at

length concerning CFS' history, systems, personnel, collection methods and performance.

186.    BlackRock 2001 Term Trust, Inc., BlackRock Strategic Term Trust, Inc.,

BlackRock Investment Quality Term Trust, Ínc., BlackRock Broad Investment Grade 2009 Term

Trust, Inc. and BlackRock Fixed Income Opportunity Fund collectively purchased approximately

$33,500,000 in SMART 97-2 Certificates in reliance upon, among other things, representations

made to BlackRock by defendants concerning the strengths of CFS' management, collection

methods and operations, its model for predicting collections from a credit card portfolio, and its

historical collection performance, including representations in the Due Diligence Books provided

by Chase Securities and CFS.  These BlackRock Fund Plaintiffs also relied on the private

placement memorandum relating to the SMART 97-2 Transaction, which was provided by Chase

Securities, as well as upon CFS' audited and unaudited financial statements.

187.    The BlackRock Plaintiffs purchased approximately $47 million SMART 97-3 and

SMART 97-4 notes in reliance upon, among other statements and omissions, each of the

representations and omissions upon which the BlackRock Plaintiffs relied in purchasing the

SMART 97-2 notes.  In addition, they also relied upon representations made in the Due

Diligence Books and private placement memorandums for SMART 1997-3 and SMART 1997-4,

as well as performance statistics reported in CFS' Monthly Statements sent to BlackRock in

connection with its earlier investments.  They also relied on CFS' audited and unaudited

financial statements.

188.    In or about June 1998, Bartmann, Brady and Mike Zarilli of Chase Securities

visited Michael Lustig, Mark Warner and Scott Amero at BlackRock's offices in New York and

solicited BlackRock to participate on behalf of its affiliates in an exchange of SMART

Certificates for securities in a master trust.  Bartmann and Chase represented at the meeting that

the master trust would be advantageous to investors because a single, master trust would provide

diversification in the form of a larger asset pool, would enable CFS to collect more efficiently, and would eliminate legal restrictions on CFS' ability to collect from the substantial numbers of individual obligors liable for receivables in two or more SMART Trusts.

189.    In June 1998, BlackRock 2001 Term Trust, Inc., BlackRock Strategic Term Trust, Inc., BlackRock Investment Quality Term Trust, Inc., BlackRock Advantage Term Trust, Inc., BlackRock Broad Investment Grade 2009 Term Trust, Inc., and Obsidian Onshore Fund participated in the GREAT 98-A Transaction in reliance upon each of the representations and omissions upon which the BlackRock Plaintiffs relied in purchasing the SMART notes.  In addition, they relied upon the representations and omissions made in discussions with Bartmann and Chase Securities during June 1998, and upon CFS' audited 1997 financial statements.

### The CGA Plaintiffs

The CGA Plaintiffs' Participation In Reliance
Upon Defendants' Fraudulent Statement and Omissions

190.    As set forth above and in detail below, at various times between September 1997 and July 1998, Chase Securities, CFS, and certain CFS Executive Defendants met with various CGA Plaintiffs to persuade them to purchase asset-backed securities issued in the SMART 97-5, SMART 97-6, SMART 98-1, and GREAT 98-A transactions.  Chase Securities, CFS, and certain CFS Executive Defendants made, among others, the following misrepresentations of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading:

A.    Based on its experience as a commercial loan servicer, CFS had developed proprietary computer-based technologies, policies, and procedures that had enabled, and would continue to enable, CFS to collect defaulted credit card receivables in substantially greater amounts than competing commercial loan servicers.

B.    CFS' experience in collections and its sophisticated proprietary software, computer systems, and collection procedures enabled CFS to assign highly accurate ECR values to individual defaulted credit card receivables.

C.    CFS' experience in servicing its existing portfolios of defaulted credit card receivables demonstrated that the ECR dollar values CFS assigned to those receivables were "conservative," and significantly less than CFS' actual collections on those receivables.  CFS had consistently obtained collections in amounts significantly greater than the ECR values it assigned to receivables.

D.    CFS "converted" hundreds of millions of dollars of defaulted, non-performing credit card receivables in the portfolios it serviced to performing loans in which the obligor generally made monthly payments to CFS on a timely basis pursuant to a payment plan agreed upon by CFS and the obligor.  Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that a substantial number of these purported "conversions" were of receivables that, under accepted standards in the asset-backed securities industry, were normally considered to be non-performing loans because the obligors had either (i) failed to make any payments within the last 12 months; or (ii) made only intermittent payments under the payment plan.

E.    CFS' historical experience in servicing portfolios of defaulted credit card receivables in the existing SMART transactions with respect to obtaining (i) "lump sum" settlements; and (ii) "conversions," consistently had been significantly better than the "base case" and "stress case" cash flow models for the applicable SMART 97-5, SMART 97-6, SMART 98-1, and GREAT 98-A transactions.

F.    CFS' "lump sum settlements" with respect to defaulted credit card receivables in its existing portfolios resulted in aggregate cash collections of more than 180% of the ECR assigned to those receivables.  Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that these purported "lump sum settlements" included amounts that CFS had obtained through sales of loans.

G.    While he was employed at Standard & Poor's ("S&P"), Thomas Hourican, Chase Securities' Director of Asset-Backed Research, developed S&P's model for rating asset-backed securities secured by defaulted credit card receivables, including securities issued in CFS-related transactions.  Based on Hourican's knowledge of S&P's model, information he obtained from CFS, and his personal knowledge of CFS senior management, Chase Securities was "comfortable" that CFS would exceed its "base case" and "stress case" cash flow models in the SMART 97-5, SMART 97-6, SMART 98-1, and GREAT 98-A transactions.

H.   CFS did not service defaulted credit card receivables on behalf of third parties.

I.   Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that, between January 1997 and September 1998 (except March 1997 and March 1998), CFS met its "base case" cash flow model for the existing SMART and GREAT 98-A transactions only by selling defaulted credit card receivables in the approximate amounts necessary to meet the "base case" targets for those transactions. Chase Securities, CFS, and certain CFS Executive Defendants failed to disclose that the variable for "collections" in the base case model employed by Chase Securities and CFS included loan sales for this purpose.

J.   Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that, in each month between September 1997 and September 1998 (except March 1998), CFS met its "base case" cash flow model for the outstanding SMART and GREAT 98-A transactions only by selling defaulted credit card receivables to Dimat Corporation, a corporation affiliated with defendant Jay Jones, at prices substantially higher than fair market value.

K.   CFS' collections on its portfolios of defaulted credit card receivables closely matched the "base case" cash flow models on the existing SMART and GREAT 98-A transactions, because CFS' sophisticated account management systems enabled it to allocate and reallocate collections personnel to ensure that each securitization met its collection targets. Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that CFS was unable to meet those targets without sales of the receivables.

L.   Due to CFS' superior collection abilities, and the over-collateralization in each of the existing SMART and GREAT 98-A transactions, CFS would retain a sizable residual after payment of all applicable fees, interest, and principal in each transaction.

M.   Arthur Anderson LLP had audited, and issued an unqualified audit opinion, with respect to CFS' 1996 financial statements, which properly included as an asset "Loan Securitization Receivables" of approximately $50.2 million.

N.   CFS properly listed "Loan Securitization Receivables" of approximately $50.2 million and $95 million, respectively, on its audited 1996 and unaudited June 1997 financial statements. These were the amounts CFS expected to obtain from "collections on the loans in excess of the full

repayment of required certificate payments, trust related expenses, and servicing costs."

O.    The November 1997 restatement of CFS' 1996 financial statements reduced CFS' "Loan Securitization Receivables" to zero.  This write-down was the result of the application of conservative accounting principles to CFS' inability to obtain a valuation from a third party that was acceptable. Notwithstanding this accounting treatment, CFS would still obtain a substantial residual after payment of all applicable fees, interest, and principal in the existing SMART and GREAT 98-A transactions, and also would receive the amounts held in escrow in the reserve fund for each of the existing SMART and GREAT 98-A transactions.  Accordingly, holders of securities issued in connection with existing SMART and GREAT 98-A transactions were still protected by a substantial residual "cushion."

P.    Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that CFS' monthly servicing reports included as "collections" amounts that CFS obtained through sales of defaulted credit card receivables.

Q.    Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that CFS engaged in the sale of substantial amounts of defaulted credit card receivables for the purpose of artificially inflating the amount of CFS' monthly collections.  Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that CFS' monthly servicing reports included as "collections" sales of defaulted credit card receivables in amounts approaching or exceeding applicable de minimis limits set forth in the relevant private placement memoranda for the existing SMART and GREAT 98-A transactions.

R.    CFS' failure to meet the "base case" cash flow model in March 1998 was due to (i) a full-staff scheduling shift that affected 3,500 CFS employees; (ii) a change in methodology for servicing "related accounts"; and (iii) the decision not to use predictive dialers on collections of certain transactions. Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that CFS did not meet its "base case" cash flow model in March 1998 because it did not sell defaulted credit card receivables from its portfolios in that month.

S.    Mitchell Vernick resigned as President and CEO of CFS because Vernick and Bartmann had "philosophical differences" and "different perspectives and opinions" relating to a variety of issues concerning the business of CFS including, among other matters, the management of the collection process, its capital market strategy, and the value of the assets serviced by it.  CFS' outside counsel investigated the reason for Vernick's resignation,

and properly concluded that the resignation was not related to any concern about management integrity, the effectiveness of CFS' collections model, or CFS' financial performance. Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that Vernick resigned for the reasons expressed in his draft resignation letter prepared in or about May 1997.

T.  Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose completely all fees that Chase Securities received in connection with the SMART and GREAT 98-A transactions. Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that Chase Securities had an extraordinary interest in those transactions because it received a finder's fee on sales of credit card receivables to CFS by Chase Manhattan Bank, N.A., the parent of Chase Securities.

191.    In late August and early September 1997, Michael Zarilli of Chase Securities suggested to Thomas Wickwire of CGAIM that CGAIM consider purchasing asset-backed securities issued in the SMART 97-5 transaction. Chase Securities thereafter arranged for representatives of CGAIM to travel to Tulsa, Oklahoma on September 4, 1997 for a one-day due diligence meeting at CFS' headquarters.

192.    On or about September 4, 1997, Martin Avidan, Greg King, and Thomas Wickwire of CGAIM met with, among others, defendants Bartmann and Brady of CFS, as well as Wayne Learned and Bruce Hadden of CFS. During the course of this meeting, Bartmann and Brady made the material misrepresentations and omissions set forth in subparagraphs (A), (B), (C), (D), (E), (F), (H), (I), (K), (L), (M), (P), (S) and (T) of paragraph [190] above.

193.    On or about September 4, 1997, CGAIM received extensive due diligence materials from CFS and Chase Securities. These due diligence materials included performance reports on past credit card securitizations, conversion and collection rates on existing portfolios of defaulted credit card receivables currently serviced by CFS, and assumptions and model runs concerning the proposed SMART 97-5 securitization. The due diligence documents contained

the material misrepresentations and omissions set forth in subparagraphs (D), (E), and (F) of paragraph 190 above.

194.    On various dates in September, October, and November 1997, Michael Zarilli, Thomas Hourican, David Schiff, and other employees of Chase Securities told Thomas Wickwire and Martin Avidan of CGAIM that the resignation of former CFS President and CEO Mitchell Vernick was based on "philosophical differences" between defendant Bartmann and Vernick. Hourican and Schiff said Vernick's resignation was voluntary, and "perhaps desirable." Hourican and Schiff also made the false statement set forth in subparagraph (S) of paragraph 190 above.

195.    On or about September 10, 1997, Martin Avidan and Greg King of CGAIM met with Thomas Hourican and other employees of Chase Securities to discuss the SMART 97-5 transaction. On or about the same date, Avidan and King also met with Michael Zarilli and David Schiff. At this meeting, Hourican gave CGAIM a detailed explanation of CFS' past performance in servicing portfolios of defaulted credit card receivables. Hourican aggressively touted CFS and the performance of the outstanding SMART transactions, as well as CFS' ability successfully to collect defaulted credit card receivables in the future.

196.    On or about September 10, 1997, Thomas Hourican advised CGAIM that he had done a significant amount of work on CFS, both at S&P and at Chase Securities. Among other things, Hourican stated without qualification, that (i) Chase Securities was "entirely comfortable" with CFS' management and its ability to service the SMART 97-5 transaction to "base case"; (ii) none of CFS' competitors had the performance data that CFS had; (iii) CFS therefore had the ability to effect collections on defaulted credit card receivables in amounts substantially greater than could be achieved by other servicers; (iv) CFS was very tightly

controlled; (v) CFS was very conservative in its valuation of receivables and in its estimates of

its ability to collect on those receivables; (vi) because the securitization was overcollateralized

and CFS "could not touch the residual" until the investors were paid in full, there was more than

enough protection for the investors; (vii) CFS' predictive models were conservatively assembled,

and were an accurate, good-faith estimate of CFS' ability to achieve collections of defaulted

credit card receivables in the future; and (viii) there was a substantial cushion to the transaction,

including a 5% reserve fund.

197.    On or about September 10, 1997, Michael Zarilli, Thomas Hourican, and David

Schiff, in substance, made the material misrepresentations and omissions set forth in

subparagraphs (A), (B), (C), (D), (E), (F), (G), (H), (I), (K), (L), (M), (P), (Q), (S), and (T) of

paragraph 190 above.

198.    On various dates in September, October, and November 1997, Michael Zarilli,

David Schiff, Hardy Viener, and Terri Pierle of Chase Securities had numerous telephone

conversations with Thomas Wickwire, Martin Avidan, and Greg King of CGAIM.  Among other

things, they discussed various models prepared by Chase Securities that reflected "base case"

and "stress case" scenarios on the SMART 97-5 transaction.  For example, on September 22,

1997, King asked Chase Securities to prepare a model run demonstrating how the transaction

would perform in various circumstances.  Chase Securities unlawfully failed to disclose the basis

for the assumptions in the model and how they related to significant variables such as

conversions, settlements, and the existence and amount of loan sales.  Chase Securities'

representations concerning the models constituted material misrepresentations and omissions, as

set forth in subparagraphs (A), (B), (C), (D), (E), (F), (H), (I), (J), (K), (L), (P), (Q) and (T) of

paragraph 190 above, because they falsely reported that the securities were overcollateralized and that the securitizations contained a cushion of residuals for CFS.

199.    On various dates between September 1997 and August 1998, Chase Securities represented that the model designed by Chase Securities to profile the performance of the SMART and GREAT 98-A transactions was proprietary to Chase Securities and could not be disclosed to CGAIM.  Chase Securities falsely represented that the model accurately analyzed data based on all variables that were relevant to modeling the performance of these securitizations, and was a highly accurate predictor of the ability of CFS to service its portfolios of defaulted credit card receivables.  Chase Securities, CFS, and the CFS Executive Defendants unlawfully failed to disclose that (i) the model was deeply flawed, and did not properly account for all variables that were relevant to the performance of an asset-backed securities transaction; (ii) the model did not accurately predict CFS' ability to service its portfolios of defaulted credit card receivables; (iii) Chase Securities employees did not understand the model, its component variables, or its analytic limitations; and (iv) the descriptions of the variables utilized by the model were misleading.  On various dates between September 1997 and August 1998, Chase Securities, CFS and the CFS Executive Defendants continued to tout the model even though they knew the model was deficient.

200.    In early October 1997, CGAIM received a PPM from Chase Securities relating to the SMART 97-5 transaction.  The PPM contained the material misrepresentations and omissions set forth in subparagraphs (L), (M), (N), (Q), and (S) of paragraph 190 above.

201.    On or about November 10, 1997, CGAIM, acting as agent for SG-1, purchased from Chase Securities $6,800,000 Floating Rate Class A-2 Asset-Backed Notes issued in the SMART 97-5 transaction.  At the time of this purchase, CGA directly and indirectly provided

insurance to SG-1 in which CGA guaranteed that SG-1 would receive payments in the amount of the interest and principal on these securities. CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-1.

202.    On or about December 3, 1997, CGAIM, acting as agent for SG-1, purchased from Chase Securities an additional $2,200,000 of the Floating Rate Class A-2 Asset-Backed Notes issued in the SMART 97-5 transaction. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1 in which CGA guaranteed that SG-1 would receive payments in the amount of the interest and principal on these securities. CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-1.

203.    On or about February 10, 1998, CGAIM, acting as agent for SG-1, purchased from Chase Securities an additional $9,600,000 Floating Rate Class A-2 Asset-Backed Notes issued in the SMART 97-5 transaction. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1 in which CGA guaranteed that SG-1 would receive payments in the amount of the interest and principal on these securities. CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-1.

204.    In making the purchases of securities issued in connection with the SMART 97-5 transaction, and in providing insurance to SG-1 with respect to the payment of interest and principal on those securities, the CGA Plaintiffs relied to their detriment on the materially false and fraudulent representations and material omissions made by Chase Securities, CFS, and certain CFS Executive Defendants, as described above.

205.    On or about November 15, 1997, Michael Zarilli and Terri Pierle of Chase Securities spoke to Thomas Wickwire and Martin Avidan of CGAIM by telephone to propose

that CGAIM consider a possible investment in asset-backed securities to be issued in connection with the SMART 97-6 transaction, which was scheduled to close prior to year-end. During this conversation, Zarilli and Pierle made the material misrepresentations and omissions set forth in subparagraphs (A), (B), (C), (D), (E), (F), (G), (H), (I), (J), (K), (L), (M), (N), (O), (P), (Q), (S) and (T) of paragraph 190 above. CFS and Chase Securities subsequently provided CGAIM with extensive due diligence materials in connection with this proposed transaction. These due diligence materials included performance reports on past credit card securitizations, conversion and collection rates on existing portfolios of defaulted credit card receivables currently serviced by CFS, and assumptions and model runs concerning the proposed SMART 97-6 securitization. The due diligence documents contained the material misrepresentations and omissions set forth in subparagraphs (D), (E), and (F) of paragraph 190 above, among others.

206.    At various times in late November and early December 1997, Terri Pierle and Michael Zarilli of Chase Securities, and defendants William Bartmann and Gertrude Brady of CFS, among others, made to CGAIM the material misrepresentations and omissions set forth in subparagraphs (A), (B), (C), (D), (E), (F), (G), (H), (I), (J), (K), (L), (M), (N), (O), (P), (Q), (S) and (T) of paragraph 190 above.

207.    On or about November 20, 1997, Michael Zarilli of Chase Securities and defendants Bartmann and Brady of CFS, among others, advised CGAIM that CFS had restated its 1996 financial statements. Among other things, the restatement reduced the $50.2 million "Loan Securitization Receivables" to zero. According to CFS, these receivables represented the discounted future collections that CFS would obtain in excess of required security payments, trust expenses, and servicing fees. Zarilli advised CGAIM that CFS wrote down these receivables because CFS and its auditors were unable to agree upon a satisfactory valuation for

this asset. Zarilli advised CGAIM, in substance, that the investors still had a substantial "cushion" in this transaction, and that CFS would obtain a substantial residual in the transactions after payment of all applicable fees, interest, and principal. In so advising CGAIM, Bartmann, Brady and Zarilli made the material misrepresentations and omissions set forth in subparagraph (O) of paragraph 190 above.

208.    On or about December 8, 1997, CGAIM received a PPM from Chase Securities relating to the SMART 97-6 transaction. The PPM contained the material misrepresentations and omissions set forth in subparagraphs (L), (Q), and (S) of paragraph 190 above.

209.    On or about December 10, 1997, CGAIM, acting as agent for SG-1, purchased from Chase Securities $14,000,000 Floating Rate Class A-2 Asset-Backed Notes issued in the SMART 97-6 transaction. At the time of this purchase, CGA directly and indirectly provided insurance to SG-1 in which CGA guaranteed that SG-1 would receive payments in the amount of the interest and principal on these securities. CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-1.

210.    In making the purchases of securities issued in connection with the SMART 97-6 transaction, and in providing insurance to SG-1 with respect to the payment of the interest and principal on those securities, CGAIM, as agent for SG-1, and CGA relied to their detriment on the materially false and fraudulent representations and material omissions made by Chase Securities, CFS, and certain CFS Executive Defendants, as described above.

211.    In addition, CGAIM, as agent for SG-1, and CGA relied on each of the representations previously made by Chase Securities, CFS, and certain CFS Executive Defendants in connection with the SMART 97-5 Transaction.

212. In January 1998, Martin Avidan of CGAIM was invited by CFS and Chase Securities to attend a seminar scheduled to coincide with the 1998 Super Bowl in San Diego, California. Mike Zarilli, Thomas Hourican, David Schiff, Hardy Viener, and Terri Pierle of Chase Securities, defendants Bartmann and Welsh and other CFS executives, also attended this seminar. Among other things, the participants in this seminar discussed asset-backed securities that were to be issued in the SMART 98-1 transaction. During this seminar, defendants Bartmann and Welsh, and Zarilli, Thomas Hourican, David Schiff, Hardy Viener and Terri Pierle of Chase Securities made the misrepresentations and omissions set forth in subparagraphs (A), (B), (C), (D), (E), (F), (I), (J), (K), (L), (Q) and (T) of paragraph 190 above.

213. In or about February 1998, CFS and Chase Securities provided CGAIM with due diligence materials on the proposed SMART 98-1 transaction. These due diligence materials included performance reports on past credit card securitizations, conversion and collection rates on existing portfolios of defaulted credit card receivables currently serviced by CFS, and assumptions and model runs concerning the proposed SMART 98-1 transaction. The due diligence documents contained the material misrepresentations and omissions set forth in subparagraphs (D), (E), and (F) of paragraph 190 above.

214. In the course of its due diligence review of the SMART 98-1 transaction, CGAIM engaged in numerous telephone conversations with defendants Bartmann and Welsh and other CFS executives, as well as Michael Zarilli and David Schiff of Chase Securities.

215. In late February 1998, CGAIM received a PPM from Chase Securities relating to the SMART 98-1 transaction. The PPM contained the material misrepresentations and omissions set forth in subparagraphs (L) and (Q) of paragraph 190 above.

216.   In or about February 1998, CGA and Capital Re Management met to discuss a proposed transaction in which KRE would agree to provide reinsurance to CGA with respect to the insurance that CGA had provided to SG-1 in connection with securities purchased in the SMART 97-5, SMART 97-6, and SMART 98-1 transactions.  Capital Re Management and CGA also discussed reinsurance with respect to future CFS securitizations.  On or about April 3, 1998, Chris Mortello of Capital Re Management and Martin Avidan of CGAIM traveled to Tulsa, Oklahoma to meet with defendants Bartmann and Brady, as well as other CFS executives at CFS' headquarters.  During this meeting, defendants Bartmann and Brady and other CFS officers made the material misrepresentations and omissions set forth in subparagraphs (A), (B), (C), (D), (E), (F), (K), (L), (M), (N), (P), (Q), and (S) of paragraph 190 above.

217.   On or about February 27, 1998, CGAIM, acting as agent for SG-1, purchased from Chase Securities $25,000,000 Floating Rate Class A-2 Asset-Backed Notes issued in the SMART 98-1 transaction.  At the time of this purchase, CGA directly and indirectly provided insurance to SG-1 in which CGA guaranteed that SG-1 would receive payment in the amount of the interest and principal on these securities.  CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-1.

218.   In making the purchases of securities issued in connection with the SMART 98-1 transaction, and in providing insurance to SG-1 with respect to the payment of interest and principal on those securities, CGAIM, as agent for SG-1, and CGA relied to their detriment on the materially false and fraudulent representations and material omissions made by Chase Securities, CFS, and certain CFS Executive Defendants, as described above.

219.    In addition, CGAIM, as agent for SG-1, and CGA relied on each of the representations previously made by Chase Securities, CFS, and certain CFS Executive Defendants in connection with the SMART 97-5 and SMART 97-6 transactions.

220.    As of February 27, 1998, Pacific Life Insurance Company ("Pacific Life") purchased approximately $50,000,000 of Fixed Rate Class A-1 Asset-Backed Notes issued in connection with the SMART 98-1 transaction.  At the time of the purchase, CGA provided insurance to Pacific Life in which CGA guaranteed that Pacific Life would receive payments in the amount of the interest and principal on these securities.  Pacific Life subsequently exchanged the Fixed Rate Class A-1 Asset-Back Notes issued in the SMART 98-1 transaction for securities issued in connection with the GREAT 98-A transaction.  On the date of that exchange, CGA provided insurance to Pacific Life in which CGA guaranteed that Pacific Life would receive payments in the amount of the interest and principal on those securities.

221.    On or about April 9, 1998, Capital Re Management, acting on behalf of KRE, advised CGA that KRE committed to reinsure up to $200 million par amount of securities issued in connection with the SMART 97-5, SMART 97-6, and SMART 98-1 transactions.  In making this commitment to CGA to provide reinsurance, Capital Re Management and KRE relied to their detriment on the materially false and fraudulent representations and material omissions made by Chase Securities, CFS, and certain CFS Executive Defendants as described above.  KRE subsequently executed agreements in which KRE agreed to provide reinsurance to CGA in connection with the purchases of securities by CGAIM on behalf of SG-1 and Pacific Life, as described above.

222.    In early May 1998, Thomas Zarilli of Chase Securities, CFS, and defendants Bartmann and Brady approached Martin Avidan of CGAIM to propose that CGAIM exchange

the Floating Rate Class A-2 Asset-Backed Notes they purchased in the SMART 97-5, SMART 97-6, and SMART 98-1 transactions for new securities that would be issued in a new securitization transaction.  Under this proposed transaction, receivables currently held in the trusts established in connection with the SMART transactions would be transferred to a new master trust, and the securities issued in connection with the SMART transactions would be exchanged for new securities issued through the master trust.  In discussions about the proposed transaction, Bartmann, Brady, and Zarilli made the material misrepresentations and omissions set forth in subparagraph (R) of paragraph 190 above.  Shortly thereafter, Chase Securities and CFS provided CGAIM with due diligence materials on the proposed GREAT 98-A transaction.  These due diligence materials included performance reports on past credit card securitizations, conversion and collection rates on existing portfolios of defaulted credit card receivables currently serviced by CFS, and assumptions and model runs concerning the proposed GREAT 98-A transaction.  The due diligence documents contained the material misrepresentations and omissions set forth in subparagraphs (D), (E), and (F) of paragraph 190 above.

223.    On or about May 12, 1998, Martin Avidan and Greg King of CGAIM traveled to Tulsa, Oklahoma to discuss the proposed exchange transaction.  At that meeting, defendant William Bartmann, Thomas Hourican and Mike Zarilli of Chase Securities, and others informed CGAIM that the principal purpose for the new master trust structure was to address a "related assets" problem.  Bartmann, Hourican, Zarilli and others falsely advised CGAIM that this change in structure was necessary because CFS' collection efforts were impaired due to legal restrictions that interfered with its ability to obtain collections from a single obligor with defaulted credit card receivables contained in more than one securitization.  During this meeting, Bartmann,

Hourican, and Zarilli made the material misrepresentations and omissions set forth in subparagraphs (K), (L) and (R) of paragraph 190 above.

224.    In a preliminary PPM dated June 26, 1998, Chase Securities, CFS, and certain CFS Executive Defendants falsely represented, among other things, that this transaction was advantageous to certain CGA Plaintiffs because (i) the master trust would provide a larger asset pool, and thus greater diversification; and (ii) it solved the "related assets" problem.  Chase Securities, CFS, and certain CFS Executive Defendants unlawfully failed to disclose that the real purpose for creating the master trust was that CFS could no longer engage in sales of defaulted credit card receivables without violating the applicable de minimis limits, and therefore would have greater difficulty concealing CFS' poor collection performance.  The PPM contained the material misrepresentations and omissions set forth in subparagraph (Q) of paragraph 190 above.

225.    On or about June 30, 1998, CGAIM, acting as agent for SG-3, purchased from Chase Securities $58,050,000 Floating Rate Class A-3 Asset-Backed Notes issued in the GREAT 98-A transaction.  At the time of this purchase, CGA directly and indirectly provided insurance to SG-3 in which CGA guaranteed that SG-3 would receive payment in the amount of the interest and principal on these securities.  CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-3.  KRE reinsured a portion of the insurance that CGA provided to SG-3.

226.    On or about July 2, 1998, CGAIM, acting as agent for SG-1, exchanged $25,000,000 SMART 98-1 Floating Rate Class A-2 Asset-Backed Notes, with a current face value of $24,396,000, for $24,396,000 Floating Rate Class A-2 Asset-Backed Notes issued in the GREAT 98-A transaction.  At the time of this purchase, CGA directly and indirectly provided insurance to SG-1 in which CGA guaranteed that SG-1 would receive payment in the amount of

the interest and principal on these securities.  CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-1.  KRE reinsured a portion of the insurance that CGA provided to SG-1.

227.    On or about July 8, 1998, CGAIM, acting as agent for GFCSG, purchased $28,000,000 Floating Rate Class A-2 Asset-Backed Notes issued in the GREAT 98-A transaction.  At the time of this purchase, CGA directly and indirectly provided insurance to GFCSG in which CGA guaranteed that GFCSG would receive payment in the amount of the interest and principal on these securities.  CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to GFCSG.  KRE reinsured a portion of the insurance that CGA provided to GFCSG.

228.    On or about July 8, 1998, CGAIM, acting as agent for SGH, purchased $22,057,000 Floating Rate Class A-2 Asset-Backed Notes issued in the GREAT 98-A transaction.  These securities were purchased in blocks of $6,083,000 and $15,974,000, respectively.  At the time of this purchase, CGA directly and indirectly provided insurance to SGH in which CGA guaranteed that SGH would receive payment in the amount of the interest and principal on these securities.  CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SGH.  KRE reinsured a portion of the insurance that CGA provided to SGH.

229.    On or about September 2, 1998, CGAIM, acting as agent for SGH and SG-3, arranged for a transaction, executed through Chase Securities, in which SG-3 purchased from SGH $22,057,000 Floating Rate Class A-2 Asset-Backed Notes issued in the GREAT 98-A transaction.  At the time of this purchase, CGA directly and indirectly provided insurance to SG-3 in which CGA guaranteed that SG-3 would receive payment in the amount of the interest

and principal on these securities.  CGA relied on the representations made to CGAIM in connection with its decision to provide this insurance to SG-3.  KRE reinsured a portion of the insurance that CGA provided to SG-3.

230.    In making the purchases of securities issued in connection with the GREAT 98-A transaction, and in providing insurance and reinsurance to SG-1, SG-3, SGH, GFCSG, and Pacific Life with respect to the payment of interest and principal on those securities, CGA, KRE, and CGAIM, as agent for SG-1, SG-3, SGH and GFCSG, relied to their detriment on the materially false and fraudulent representations and material omissions made by Chase Securities, CFS, and certain CFS Executive Defendants as described above.

231.    In addition, CGA, KRE, and CGAIM, as agent for SG-1, SG-3, SGH, and GFCSG, relied on each of the representations previously made by Chase Securities, CFS, and certain CFS Executive Defendants in connection with the SMART 97-5, SMART 97-6, and SMART 98-1 transactions.

232.    Since the bankruptcy of CFS and CFS-related entities, CGA and KRE have made payments pursuant to their insurance and reinsurance obligations and are subrogated to the rights of SG-1, SG-3, SGH, and GFCSG with respect to the purchase and ownership of securities issued in connection with the SMART 97-5, SMART 97-6, SMART 98-1, and GREAT 98-A transactions.

### The H&W Plaintiffs

The H&W Plaintiffs' Reliance On
Defendants' Fraudulent Statements And Omissions

233.    Chase Securities salesman Kevin Clare originally solicited the H&W Plaintiffs, through their investment advisor, H&W, to invest in the securities of SMART 97-5.

234.    On or about September 3, 1997, a conference call was set up between H&W and

Kevin Clare and Terry Pierle, two representatives of Chase.

235.    During that conference, the Chase representatives made the following statements:

- Chase described the structure of the deal, the price CFS expected to pay for the debt
  (9-10¢), the price CFS expected to receive for the notes (20¢), and the amount CFS
  expected to collect on the debt (30¢).

- Mitch Vernick's resignation resulted from disagreements over: (1) how to grow the
  CFS business; and (2) the allocation of collections among the trust.

- Bartmann's differences with Vernick caused the poor collections in March 1997.

- CFS' collection performance for all prior SMARTs met or exceeded base case.

- The fact that CFS retained an interest in the residual gave CFS an incentive to pay off
  the notes.

236.    After the conference call, but prior to the purchase of the SMART 97-5 Notes,

H&W had further conversations with Mike Zarilli and Terri Pierle regarding the ECR model

used by CFS.

237.    On or about September 24, 1997, H&W purchased Notes issued by the SMART

97-5 Trust in the amount of approximately $5,700,000 for various of the H&W Plaintiffs' funds

in reliance on the representations and documentation described above, the due diligence material

CFS and the other defendants provided in connection with the SMART 97-5 Trust, the Private

Placement Memorandum for SMART 97-5, the financial statements of CFS, and other

information describing CFS' historical collection performance.

238.    On or about February 24, 1998, H&W purchased Notes issued by the SMART

98-1 Trust, which was subsequently converted to the Great 98-1 Trust in the amount of

approximately $5,854,000 for various of the H&W Plaintiffs in reliance on the representations

and documentation described above, the due diligence material CFS and the other defendants

provided in connection with the SMART 97-5 Trust, the Private Placement Memorandum for

SMART 97-5, the financial statements of CFS, the "A" rating given on the prior securitizations by Standard & Poor's and Duff & Phelps, and other information describing CFS' historical performance.

239.   At no time prior to the purchase by the H&W Plaintiffs of the SMART 97-5 and the SMART 1998-1 notes did anyone tell H&W or the H&W Plaintiffs about the sales of the credit card receivables to Cadle & Co., Dimat, or any other entity, the reasons for those sales, or the impact of those sales on CFS' historical collection performance.

240.   In April 1998, H&W representative Mike Sanchez traveled to Tulsa for a due diligence meeting.  During this visit, Sanchez was given a tour of the CFS facilities.

241.   Among the persons who spoke at this Tulsa due diligence meeting were Bartmann, Mike Zarilli and Terry Pierle of Chase, and Giles Harrison for B.T. Alex Brown.

242.   During the Tulsa due diligence meeting, the following statements were made:

- March 1998 collections were down due to legal issues and the problems of debtors being listed in multiple pools.

- The March problems had been solved; there would be an allocation of collections from debtors in multiple pools.

- Bartmann stated that the rating agencies were unhappy about the allocations of collectors to trusts in order to meet base case collections, then explained that CFS collects to base case, making such allocations part of the CFS model.

- The conversion to a master trust would allow CFS to retain its team approach to collections.

- CFS preferred to convert loans rather than accept lump sum payments.

243.   During the Tulsa due diligence visit, there were no discussions about the sales of CFS' credit card receivables to Cadle, Dimat, or any other entity, the reasons for those sales, or the impact of those sales on CFS' collection performance.

**The Hyperion Plaintiffs**

The Hyperion Plaintiffs' Participation in Reliance
on Defendants' Fraudulent Statements and Omissions

244.    On or about March 3, 1997, HCM purchased a total of $9 million of notes issued

in the SMART 97-2A offering on behalf of its clients.  Of those securities, HCM purchased

$3 million for HTR, $2 million for KCERA and $4 million for Enhance.

245.    Prior to Hyperion's purchase of the SMART 97-2A certificates, Chase provided

Hyperion with CFS due diligence materials relating to SMART 97-2, which included CFS

financial statements, information on CFS' organization and management, and tables and graphs

purporting to show that CFS' collections and repayment of notes on all prior securitizations met

or exceeded base case.  Chase also provided Hyperion with various cashflow projections

showing expected collections under the base and stress case, as well as the PPM relating to the

SMART 97-2 transaction.

246.    Hyperion purchased the SMART 97-2A certificates in reliance on, among other

things, representations by defendants concerning the strengths of CFS' management, collection

methods and operations, its model for predicting collections from a credit card portfolio, and its

historical collection performance, including representations in the due diligence books provided

by Chase and CFS.  Hyperion also relied on the PPM relating to the SMART 97-2 transaction, as

well as upon CFS' financial statements.

247.    On or about May 20, 1997, HCM portfolio manager John Dunleavy visited CFS'

headquarters in Tulsa, Oklahoma.  Prior to that visit, Chase supplied Dunleavy with an agenda

dated May 15, 1997 in which Chase outlined key facts about the company to be touted at a

meeting at CFS headquarters.  The agenda described the company's history, organization,

management and infrastructure, among other things.  According to the agenda, the meeting was

also to include representations concerning the status of previous CFS deals and the opinions of rating agencies concerning CFS and its securities. Hyperion relied on the representations made during this visit in all its subsequent purchases of CFS securities.

248.    On or about July 30, 1997, HCM purchased a total of $18 million of notes issued in the SMART 97-4 offering on behalf of its clients. Of those securities, HCM purchased $8 million for ATRS, $2 million for HTR, $2 million for Southwestern Life, $2 million for Security Life, $2 million for KCERA and $2 million for EURIBOR.

249.    Prior to Hyperion's purchase of the SMART 97-4 certificates, Chase provided Hyperion with CFS due diligence materials relating to SMART 97-4, which included CFS financial statements, information on CFS' organization and management, and tables and graphs purporting to show that CFS' collections and repayment of notes on all prior securitizations met or exceeded base case. Chase also provided Hyperion with various cashflow projections showing expected collections under the base and stress case, as well as the PPM relating to the SMART 97-4 transaction.

250.    Hyperion purchased the SMART 97-4 certificates in reliance on, among other things, representations by defendants concerning the strengths of CFS' management, collection methods and operations, its model for predicting collections from a credit card portfolio, and its historical collection performance on the previously purchased issue, including representations in the due diligence books provided by Chase and CFS. Hyperion also relied on the PPM relating to the SMART 97-4 transaction, as well as upon CFS' financial statements. Hyperion also relied on the representations made by CFS and Chase during John Dunleavy's May 1997 site visit.

251.    On or about September 24, 1997, HCM purchased a total of $19 million of notes in the SMART 97-5 offering on behalf of its clients. Of those securities, HCM purchased

$4 million for Southwestern Life, $2 million for EURIBOR, $11 million for ATRS and $2 million for KCERA. Also on or about September 24, 1997, HCM purchased a total of $4 million of notes in the SMART 97-5 offering on behalf of its client Keyport.

252.    Prior to Hyperion's purchase of the SMART 97-5 certificates, Chase provided Hyperion with CFS due diligence materials relating to SMART 97-5, which included CFS financial statements, information on CFS' organization and management, and tables and graphs purporting to show that CFS' collections and repayment of notes on all prior securitizations met or exceeded base case. Chase also provided Hyperion with various cashflow projections showing expected collections under the base and stress case, as well as the PPM relating to the SMART 97-5 transaction.

253.    Hyperion purchased the SMART 97-5 certificates in reliance on, among other things, representations by defendants concerning the strengths of CFS' management, collection methods and operations, its model for predicting collections from a credit card portfolio, and its historical collection performance on previously purchased issues, including representations in the due diligence books provided by Chase and CFS. Hyperion also relied on the PPM relating to the SMART 97-5 transaction, as well as upon CFS' financial statements. Hyperion also relied on the representations made by CFS and Chase during John Dunleavy's May 1997 site visit.

254.    On or about December 5, 1997, HCM purchased a total of $18 million of notes in the SMART 97-6 offering on behalf of its clients. Of those securities, HCM purchased $2 million for EURIBOR, $3 million for Enhance and $13 million for OBWC. Also on or about December 5, 1997, HCM purchased $3 million of notes in the SMART 97-6 offering on behalf of its client Keyport.

255.   Prior to Hyperion's purchase of the SMART 97-6 certificates, Chase provided Hyperion with CFS due diligence materials relating to SMART 97-6, which included CFS financial statements, information on CFS' organization and management, and tables and graphs purporting to show that CFS' collections and repayment of notes on all prior securitizations met or exceeded base case. Chase also provided Hyperion with various cashflow projections showing expected collections under the base and stress case, as well as the PPM relating to the SMART 97-6 transaction.

256.   Hyperion purchased the 97-6 certificates in reliance on, among other things, representations by defendants concerning the strengths of CFS' management, collection methods and operations, its model for predicting collections from a credit card portfolio, and its historical collection performance on previously purchased issues, including representations in the due diligence books provided by Chase and CFS. Hyperion also relied on the PPM relating to the SMART 97-6 transaction, as well as upon CFS' financial statements and upon the "A" ratings given to the SMART 97-6 certificates by S&P and Duff & Phelps. Hyperion also relied on the representations made by CFS and Chase during John Dunleavy's May 1997 site visit.

257.   On or about February 12, 1998, HCM portfolio manager David Ricci visited CFS' headquarters in Tulsa. Ricci met with representatives of CFS and Chase. CFS held a meeting at which Bartmann and other CFS representatives made representations about CFS, its business and its facilities. Among other things, Bartmann touted CFS' success in collections, citing awards CFS had received. Ricci also toured the CFS facilities during his visit.

258.   On or about July 2, 1998, HCM converted $16 million of the $18 million (original face value) of SMART 97-4 notes it had purchased on July 30, 1997 to GREAT 98-A bonds.

259.    Hyperion converted the SMART 97-4 certificates in reliance on, among other things, representations by defendants concerning the strengths of CFS' management, collection methods and operations, its model for predicting collections from a credit card portfolio, and its historical collection performance on previously purchased issues, including representations in the due diligence books provided by Chase and CFS.  Hyperion also relied on the PPM relating to the GREAT 98-A transaction, as well as upon CFS' financial statements.  Hyperion also relied on the representations made by CFS and Chase during John Dunleavy's May 1997 site visit and during David Ricci's February 1998 site visit.

260.    On or about February 1, 1999, Keyport transferred its CFS asset-backed securities portfolio to Stein Roe.

### The ING Plaintiffs

#### The ING Plaintiffs' Reliance Upon Defendants'
#### Fraudulent Statements and Omissions

261.    CFS, Bartmann and Brady solicited ING to purchase SMART 96-2 notes on behalf of one or more of the ING Plaintiffs in a series of discussions during May and June 1996, including discussions with ING's disclosed investment advisor, Structured Financial Advisors, Inc., and discussions during ING's "due diligence" visit to CFS' offices in Tulsa on June 13, 1996.  During their discussions, CFS, Bartmann and Brady made scores of statements touting, among other things, the purported strengths of CFS' management and personnel, CFS' collection approach and operations, its model for predicting collections from a portfolio of credit card receivables, CFS' historic collections performance and the "conservatism" built into CFS' Base Case and Stress Case cash flow models.

262.    On or about June 19, 1996, Life Insurance Company of Georgia, Southland Life Insurance Company, Indiana Insurance Company, Security Life of Denver Insurance Company

and Peerless Insurance Company purchased a total of approximately $22.5 million in SMART

96-2 certificates in reliance upon the following statements and omissions, among others:

- Representations by CFS, Bartmann and Brady that the SMART 96-2 certificates were vastly overcollateralized because the underlying collateral was a portfolio of credit card debt from which CFS expected to collect $181,900,000 – even applying its "conservative" "base case" assumptions, which were represented to be slightly more conservative than CFS' actual experience – and CFS needed to collect only $113,900,000 to pay the principal and interest owed under the notes;

- Representations by CFS, Bartmann and Brady that Expected Cash Flows, even under the pessimistic Stress Case, were $111.5 million, an amount sufficient to pay principal and interest owed under the notes;

- Representations by CFS, Bartmann and Brady that CFS had since its inception collected 104% of the Initial ECR value CFS had assigned to loans that it had serviced;

- Representations by CFS, Bartmann and Brady that for portfolios of charged-off credit card debt, CFS' actual collections experience exceeded the ECR value CFS had assigned to the portfolios by a factor of 2.78;

- Representations by CFS, Bartmann and Brady that CFS had developed a unique collections philosophy and procedure and sophisticated systems;

- Representations by CFS, Bartmann and Brady that CFS had demonstrated an ability to accurately value the estimated collectability of loan portfolios and to consistently collect an amount equal to or greater than its estimated figure;

- Representations by CFS, Bartmann and Brady that CFS had adequately built up its personnel and equipment to properly service the increased volumes of loans it was beginning to service under its emerging program of credit card asset backed securitizations;

- Representations by CFS, Bartmann and Brady that, historically, only 7% of the converted credit card loans went into default after CFS reached a payment plan with the obligor;

- CFS' certified financial statements and statements by Arthur Andersen that it would monitor portfolio performance in accordance with the Agreed-Upon Procedures.

263.    On or about December 23, 1996, Columbine Life Insurance Company and

Midwestern United Life Insurance Company, purchased a collective total of approximately

$15 million in notes issued by SMART 96-4 in reliance upon, among other representations and

omissions, each of the representations and omissions on which the ING relied in making the

purchases the SMART 96-2 certificates.  They also relied upon the following, among others:

- CFS' audited and unaudited financial statements;

- data supplied by CFS between June and December, 1996, including in monthly "servicer reports" and in "due diligence" materials, purporting to show CFS' ongoing performance in converting and collecting on the credit card debt held in the SMART 96-2 and other portfolios.

264.    On or about March 6, 1997, ING on behalf of Columbine Life Insurance

Company purchased a collective total of approximately $11,000,000 in notes issued by SMART

97-2 in reliance upon, among other representations and omissions, each of the representations

and omissions on which the ING relied in making the purchases of the SMART 96-4 notes.

They also relied upon the following, among others:

- CFS' certified financial statements through 1996;

- Additional data supplied by CFS and Chase Securities, including in Monthly Statements and in Due Diligence Books, purporting to show CFS' ongoing performance in converting and collecting on the credit card debt held in outstanding portfolios;

- Representations in the PPMs, prepared and supplied by Chase Securities and Due Diligence Books supplied by Chase Securities, relating to the SMART 1997-2 Transaction.

265.    On or about December 10, 1997, ING, on behalf of Columbine Life Insurance

Company and Golden American Life Insurance Company, purchased a collective total of

approximately $28 million in notes issued by SMART 97-6 in reliance upon, among other

representations and omissions, each of the representations and omissions on which ING relied in

purchasing the SMART 97-2 Certificates.  They also relied upon the following, among others:

- CFS' audited financial statements through 1996 and unaudited financial statements through September 1997;

- Additional data supplied by CFS, including in Monthly Statements and in Due Diligence Books, purporting to show that CFS was, on a cumulative basis, performing at or better than base case projection on each transactions in which any of the ING Insurance Group Plaintiffs was participating and on all prior CFS-sponsored securitizations;

- Representations by CFS in its performance report that CFS was converting charged-off credit card receivables to "Performing" loans at higher than expected rates on all three transactions in which the ING Insurance Group Plaintiffs had participated;

- Representations by CFS, Bartmann and Brady that CFS' actual collections over the three years since it began purchasing credit card portfolios exceeded Model ECR by a factor of 1.82;

- Representations by CFS, Bartmann and Brady that the Expected Cash Flows for the SMART 97-6 Transaction were $581.2 million under the Base Case, and $359.8 million under the Stress Case, while the principal balance of the securities was only $220 million, indicating that the risk of default was minimal;

- Representations by CFS, Bartmann and Brady that, historically, only 6% of the converted credit card loans went into default after CFS reached a payment plan with the obligor;

- Tables purportedly prepared by and sent by Chase Securities on December 8, 1997 showing that Expected Collections Available for Debt Service for the SMART 1997-6 Transaction were $469,414,674 under the Base Case assumptions, and $287,059,280 under the Stress Case, and that the amounts needed for Expected Debt Service were only $211,779,105 under the Base Case, and $8,842,284 under the Stress Case;

- Representations in the PPMs, prepared and supplied by Chase Securities and in the Due Diligence Books supplied by Chase Securities relating to the SMART 1997-6 Transaction.

266. In February 1998, Columbine Insurance Company, USG Annuity & Life Company, Security Life of Denver Insurance Company, Golden American Insurance Company and Life Insurance Company of Georgia purchased a collective total of approximately $21.2 million in Notes issued by SMART 98-1 in reliance upon, among other representations and omissions, each of the representations and omissions on which ING relied in purchasing the SMART 97-6 Certificates. They also relied upon the following, among others:

- CFS' audited financial statements through 1997;

- Additional data supplied by Chase Securities and CFS, including in Monthly Statements and in Due Diligence Books supplied by Chase Securities, and during a ING's due diligence visit to CFS' offices in January 1998, purporting to show that CFS was, on a cumulative basis, performing at or better than base case projection on each transaction in which any of the ING Insurance Group Plaintiffs was participating and on all prior CFS-sponsored securitizations;

- Representations in tables purportedly prepared by Chase Securities on February 27, 1998, that Estimated Collectability of the SMART 98-1 portfolio was approximately $534.5 under the Base Case, more than $190 million more than was needed to pay principal and interests on the notes and certificates to be issued in the transaction, and that Estimated Collectability under the Stress Case was $332.6 million;

- Representations by CFS in its performance reporting that CFS was converting charged-off credit card receivables to "Performing" loans at higher than expected rates on all three transactions in which the ING Insurance Group Plaintiffs had participated;

- Representations by CFS, Bartmann and Brady that that, historically, only 6% of the converted credit card loans went into default after CFS reached a payment plan with the obligor;

- Representations by CFS, Bartmann and Brady that CFS' actual collections over the three years since it began purchasing credit card portfolios exceeded Model ECR by a factor of 1.81;

- Representations in the PPMs, prepared and supplied by Chase Securities, and in Due Diligence Books, supplied by Chase Securities, relating to the SMART 1998-1 Transaction.

267.     In May 1998, Chase Securities and CFS solicited ING to exchange SMART certificates for certificates issued by a master trust. Chase Securities and CFS stated that the master trust would be advantageous to investors because it would provide diversification in the form of a larger asset pool, would enable CFS to collect more efficiently, and would eliminate restrictions on CFS' ability to collect from obligors whose debts were spread among two or more trusts.

268.     In June 1995, Columbine Insurance Company, USG Annuity & Life Company, Security Life of Denver Insurance Company, Golden American Insurance Company and Life Insurance Company of Georgia exchanged SMART 98-1 notes for notes issued by the GREAT

98-A Trust in reliance upon each of the representations and omissions upon which it relied in making the purchases of the SMART notes. In addition, they relied upon representations made by Chase and CFS at a due diligence meeting on May 1998 concerning the reasons a master trust was advantageous to SMART investors, and upon additional representations concerning the purported advantage of the master trust made by Chase Securities during May 1998 conference calls with investors. They also relied upon data supplied by CFS through May 1998, including monthly servicer reports and "due diligence" materials supplied by Chase Securities and purporting to show CFS' collection performance on all outstanding securitizations. ING also relied upon CFS' audited financial statements through 1997, and Representations in the PPM and Due Diligence Books supplied by Chase Securities and relating to the GREAT 1998-A Transaction.

### Keyport Life Insurance Company

269.    In or about July 1997, Candace Conn and Tom Hourican of Chase Securities met with Angelo Manioudakis, a principal at Miller, Anderson & Sherred, LLP ("Miller"). During this presentation, Conn and Hourican talked about CFS and explained the structure of the SMART note offerings.

270.    As part of this and subsequent sales discussions, Conn, Hourican and others from Chase Securities represented that CFS had a history of collecting more money from the underlying credit card debt than needed to pay the principal and interest on the notes. The Chase Securities personnel especially highlighted the success of CFS' collection techniques, the ability of its technology and the predictive ability of CFS' collections model.

271.    Chase Securities also provided Miller with a binder of written materials touting CFS and its collection abilities. Included in these materials was the CFS private placement

memorandum for SMART 97-4. Chase latter provided similar materials distributed in connection with the SMART 97-5 note offering including the SMART 97-5 private placement memorandum.

272.    Miller also reviewed the CFS financial information included in the private placement memorandum, and took comfort in the consistent financial performance of CFS as shown in the audited financial statements. Especially important to Miller was the value CFS assigned to the residual value of the underlying credit card debt.

273.    Miller questioned Chase Securities regarding the CFS model, the assumptions underlying the model and the competency of the back-up servicer. In response, Chase Securities confirmed the ability of the model to predict cash flow and of the credit enhancement provided by the backup servicer.

274.    In October 1997, Scott Radell, a Miller analyst, toured the CFS facilities in Oklahoma. At a presentation put on by Bartmann, Brady, other CFS executives, and Chase Securities, the CFS personnel reiterated CFS' purportedly superior ability at collecting credit card debt, CFS historical credit card collection results and the ability of the model to predict future performance. Nothing was said about bulk sales of credit card debt from the existing SMART portfolios.

275.    In or about this same time period, Miller received additional materials, including the SMART 97-6 private placement memorandum from Chase Securities. These materials, as well as further oral representations from Chase securities, contained representations of CFS' continued ability to collect debt at levels sufficient to retire the notes. Further, Miller began to receive servicer reports related to the SMART 97-5 offering that showed collections exceeding the base case estimations of CFS.

276.    In early 1998, Chase Securities again approached Miller with the opportunity to purchase notes in the SMART 98-1 offering.  Chase provided Miller with written and oral representations, including the SMART 98-1 private placement memorandum, that showed CFS' continued ability to collect credit card debt.  These notes again received the investment grade ratings from the rating agencies and CFS' financial statements.

277.    In February 1998, Miller, as investment advisor to and on behalf of Keyport Life Insurance Company, purchased notes in the SMART 98-1 offering with a face amount of $3,975,000.

278.    In April 1998, Miller received CFS' collection results for March 1998 and questioned CFS and Chase Securities regarding the drop in collections during March 1998.

279.    In an April 1998 phone call with Bartmann and Brady of CFS, and Terri Brode of Chase Securities, Bartmann told Miller that restructuring of personnel shifts caused the drop in collections.  Nothing was said about how the absence of loan sales had caused reported collections to decrease.

280.    During April, May and June 1998, Terri Brode and others at Chase Securities had conversations with Miller personnel about converting the SMART to GREAT notes.  Chase Securities said that CFS wanted to adopt the GREAT structure because of concerns of complying with Fair Debt Collections Practices Act.

281.    Chase Securities provided Miller with additional written and oral representations, including the GREAT 98-A private placement memorandum.  In these communications, Chase Securities continued to tout CFS historical performance, its superior collections abilities and the predictive ability of the collections model.

282.   In June 1998, Keyport Life Insurance Company, through its investment advisor, Miller, exchanged the notes it had purchased in the SMART 1998-1 offering for notes of like face amount in the GREAT 98-A offering.

283.   In its decision to purchase notes offered by the Trusts, representations made to its agent, Miller, by CFS, CFS executives and Chase Securities were substantial factors. But for these representations, Keyport Life Insurance Company would not have purchased theses notes.

### The ML Plaintiffs

The ML Plaintiffs' Reliance On
Defendants' Fraudulent Statements and Omissions

284.   Chase Securities salesman Owen Johnson first solicited the ML Plaintiffs, through their discretionary investment advisor, MLAM, to invest in the securities of SMART 97-5.

285.   A meeting was scheduled for September 19, 1997 with Chase representatives Terri Pierle, Mike Zarilli, David Schiff and Tom Hourican.

286.   During that meeting Chase representatives made the following statements:

- Tom Hourican had followed CFS for a long time as an analyst at a major rating agency, leading the analysis of that agency's rating of CFS. Hourican stated that he was impressed with CFS' management, collection practices and performance, and its ECR model.

- Chase described the basics of the ECR model and emphasized the model's demonstrated history of success in estimating recovery values.

- Chase said CFS had two collection assumptions: (1) payment plans negotiated with the debtor, and (2) lump sum payments negotiated with the debtor.

- When questioned, Hourican reaffirmed his confidence in the predictive ability of the ECR model.

- Chase emphasized that CFS' collection performance for the prior SMARTs had consistently exceeded the base case expectations, proving its superior ability to collect greater amounts than its competitors.

- Zarilli also described his close relationship with CFS and Bartmann.

- Zarilli said he expected CFS to become a very large player in the ABS market.

- Zarilli said he was very impressed by CFS' ability as a collector and was also impressed by Bartmann as an individual.

287.     At all times prior to the closing of SMART 97-5, CFS and Chase told the ML Plaintiffs, through their discretionary investment advisor, MLAM, that sales of the collateral would not be a meaningful part of the collection process.

288.     On or about September 29, 1997, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, purchased notes issued by the SMART 97-5 Trust in the amount of $4,700,000 in reliance on the representations and documentation described above, the due diligence material CFS and other defendants provided in connection with the SMART 97-5 Trust, the Private Placement Memorandum for SMART 97-5, the financial statements of CFS, and the information describing CFS' historical collection performance.

289.     On October 21, 1997, MLAM representative John Burger traveled to Tulsa for a due diligence visit.

290.     Among the persons who spoke during the Tulsa due diligence visit were Bartmann, Brady, Welsh, Mike Zarilli, Terry Pierle and Wayne Learned.

291.     During that Tulsa due diligence meeting the following statements were made:

- CFS' method of collection was to look for payment plans from the account debtors, or, alternatively, lump sum settlements with the debtors;

- CFS had a consistent record of exceeding collections over and above its base case. CFS had successful collections on all of its collection models;

- the resignation of Mitchell Vernick was related to "management style" differences between Vernick and Bartmann, and unrelated to any significant issues.  Vernick's resignation was described as voluntary;

- CFS had developed superior, proprietary practices, procedures and technology systems that enabled CFS to collect substantially greater amounts than its competitors. Furthermore, these systems, practices and procedures enabled CFS to produce an accurate recovery model (ECR).

292.    On or about December 10, 1997, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, purchased notes issued by the SMART 97-6 Trust in the amount of $5,000,000 in reliance on the representations and documentation described above, the due diligence material CFS and other defendants provided in connection with the SMART 97-6 Trust, the Private Placement Memorandum for SMART 97-6, the financial statements of CFS, and the information describing CFS' historical collection performance.

293.    On or about February 27, 1998, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, purchased notes issued by the SMART 98-1 Trust in the amount of $5,000,000 in reliance on the representations and documentation described above, the due diligence material CFS and other defendants provided in connection with the SMART 98-1 Trust, the Private Placement Memorandum for SMART 98-1, the financial statements of CFS, and the information describing CFS' historical collection performance.

294.    In May 1998, MLAM received a memo from Chase detailing a Master Trust financing structure. CFS offered to exchange existing securities for the Master Trust securities.

295.    A meeting was held on May 19, 1998 hosted by Mike Zarilli. A representative of MLAM attended the meeting on behalf of the ML Plaintiffs. Other Chase personnel and CFS personnel were present.

296.    During the May 19, 1998 meeting, the following representations were made by CFS and Chase:

- the primary reasons the March 1998 collections were below previous months was (1) the break-up of established collection terms to a 24 hours per day, 7 days a week collection effort; (2) due to problems caused by debtors with receivables in more than

one pool. There were legal limits to how often any debtor could be contacted. If combined into one large pool, collectors would make one collection effort. Those problems had been resolved, evidenced by April 1998 collections which were back on schedule.

- All Trusts were performing above the base case and the ECR model continued to be reliable.

- Older deals would benefit from a pro rata share if fresh receivables to be added to the Master Trust.

297.    Subsequent to this meeting, MLAM representatives (acting as agents and advisors to the ML Plaintiffs) had several discussions with Mike Zarilli and Owen Johnson. At no time did Chase or CFS ever disclose to MLAM or the ML Plaintiffs that (1) Chase had become concerned about the business practices at CFS; (2) substantial third-party sales were occurring; (3) nonperforming loans were being sold; (4) collection targets were consistently not being met absent third-party sales; or (5) third-party sales of nonconforming loans were being classified as "collections" in company reports.

298.    In June 1998, the ML Plaintiffs, acting through their discretionary investment advisor, MLAM, exchanged their SMART 98-1 notes for notes issued by the GREAT 98-A in reliance upon the representations and documentation described above, the due diligence material CFS and other defendants provided in connection with the GREAT 98-A Trust, the Private Placement Memorandum for GREAT 98-A, the financial statements of CFS, and the information describing CFS' historical collection performance.

### The Stein Roe Plaintiffs

The Stein Roe Plaintiffs' Reliance On Defendants'
Fraudulent Statements and Omissions

299.    Chase Securities solicited Stein Roe to invest in the securities of SMART 97-2.

300.    Stein Roe spoke to Terri Pierle, Mike Zarilli, David Schiff, Andrew Dym, and Jamie Egbert in several telephone calls.

301.    During a series of telephone calls, Chase represented to Stein Roe the ECR was predictive and that CFS would be able to collect enough of the credit card debt to pay off the investor notes.

302.    On March 5, 1997, Stein Roe representative Richard Hegwood traveled to Tulsa for a due diligence visit.

303.    Among the persons who spoke at this Tulsa due diligence visit were Bill Bartmann and other CFS employees.

304.    During this Tulsa due diligence meeting the following representations were made:

- The proprietary model was based upon converting "non-performing" loans to "performing" loans where obligors made payments on their debt over time, or satisfied their obligation by making a lump sum payment.

- Although CFS would not disclose all the elements of the ECR model, Bartmann characterized the model as conservative.

- Bartmann touted the unique, time-tested collection process, supported by state-of-the-art computer programs and systems, as well as the dedicated collection team CFS used in the collection process for each trust.

- Bartmann said CFS' collection performance for each securitization met or exceeded the base case.

- CFS would purchase credit card receivables and hold them forever.

- ECR contained only cash flows from recovery from the loans.

305.    The information Stein Roe received prior to investing in SMART 97-2 included an analysis of the base case and stress case collection models for SMART 97-2.

306.    Prior to the issuance of the notes by SMART 97-2, Chase represented to Stein Roe that:

- SMART 97-2 was significantly over collateralized;

- CFS' collection performance for each of the earlier SMARTs met or exceeded base case;

- the ECR model was a valid predictor of CFS' ability to collect at the base case level for the 97-2 transaction.

307.     On or about March 6, 1997 Stein Roe, on behalf of Keyport Life Insurance Company purchased notes issued by the SMART 97-2 Trust in the amount of $20,000,000 in reliance on the representations and documentation furnished by and about CFS, the due diligence material CFS and the other defendants provided in connection with the SMART 97-2 Trust, the Private Placement Memorandum for SMART 97-2, the financial statements of CFS, and other information describing CFS' historical collection performance, and such other materials and information disseminated by CFS and other defendants as described herein relative to Stein Roe, and as more generally set forth in this Complaint.

308.     Prior to the issuance of the SMART 97-3 notes, Stein Roe spoke to Terri Pierle and other representatives of Chase. During these conversations, the Chase employees represented that SMART 97-3 was structurally the same as 97-2 with different assets, and further, with respect to SMART 97-3, made the representations set forth above.

309.     On or about April 10, 1997 Stein Roe, on behalf of Keyport Life Insurance Company purchased notes issued by the SMART 97-3 Trust in the amount of Thirteen Million ($13,000,000) Dollars in reliance on the representations and documentation furnished by and about CFS, the due diligence material CFS and the other defendants provided in connection with the SMART 97-3 Trust, the Private Placement Memorandum for SMART 97-3, the financial statements of CFS, and other information describing CFS' historical collection performance, all materials and information upon which it relied in purchasing the SMART 97-2 notes, and such other materials and information disseminated by CFS and other defendants as described herein relative to Stein Roe, and as more generally set forth in this Complaint.

310.    In June 1997, Chase and Bartmann advised Stein Roe in several telephone calls that Mitch Vernick had resigned.  During these telephone calls the following representations were made:

- Chase told Stein Roe that Vernick's resignation resulted from a clash of egos and personalities.

- Bartmann told Stein Roe that he was a strong willed personality, that Mitch Vernick wanted to make changes at CFS, and that Bartmann did not want to make these changes;

- Bartmann and Chase told Stein Roe that the drop in collections in March 1997 was the result of changes made by Vernick that did not work, and that collections were returning to normal;

- Bartmann and Chase told Stein Roe that Bartmann had asked Vernick to resign because Bartmann did not agree with Vernick's changes to collections procedures.

311.    On or about August 6, 1997, Stein Roe, on behalf of Chrysler Insurance Company, purchased notes issued by the SMART 97-4 Trust in the amount of One Million ($1,000,000) Dollars in reliance on the representations and documentation furnished by and about CFS, the due diligence material CFS and the other defendants provided in connection with the SMART 97-4 Trust, the Private Placement Memorandum for SMART 97-4, the financial statements of CFS, and other information describing CFS' historical collection performance, all materials and information upon which it relied in purchasing the SMART 97-2 and 97-3 notes, and such other materials and information disseminated by CFS and other defendants as described herein relative to Stein Roe, and as more generally set forth in this Complaint, including assurances made in connection with the departure of Mitch Vernick.

312.    Stein Roe, as investment advisor to Keyport Life Insurance Company and Chrysler Insurance Company, continued to hold the aforementioned securities in reliance upon

the materials and information disseminated by CFS and other defendants as described herein relative to Stein Roe, and as more generally set forth in this Complaint.

313.    Stein Roe, on behalf of Chrysler Insurance Company, exchanged the SMART 97-4 notes for the GREAT 98A notes, in reliance upon the materials and information disseminated by CFS and other defendants as described herein relative to Stein Roe, and as more generally set forth in this Complaint.

**The Western Asset Plaintiffs**

Western Asset Reliance On Defendants'
Fraudulent Statements And Omissions

314.    B.T. Alex Brown salesman Will Evers originally solicited Western Asset to invest in the securities of the Great 1998 A

315.    On or about May 4, 1998, a conference call was set up between Western Asset and representatives of B.T. Alex Brown, Will Evers and Giles Harrison.

316.    Prior to the conference call, B.T. Alex Brown delivered to Western Asset approximately 20 pages of background information on CFS and the prior securitizations.

317.    During that conference call, B.T. Alex Brown discussed with Western Asset the following:

- The structure of the deal, the price CFS expected to pay for the credit card debt (9-10 cents) and the amount CFS expected to collect on the credit card debt (25 cents);

- that S&P had given CFS a rating of "strong" as a servicer;

- the credit card debt was 90% fresh accounts, no B or C credits, Visa and Master card only;

- the credit card debt did not include bankruptcies, but rather were for debtors who had had an opportunity to file for bankruptcy but had not done so, such that the debt was collectible over time;

- CFS had forward flow contracts which locked in future sales;

- the collections curve of SMART 97-5; Securities weighted average life 2.5-3 years, expected final 5 years;

- that CFS retained rights to the residual, that the bulk of CFS servicing income would come from the residuals, so that CFS had every incentive to pay off the investor notes;

- B.T. Alex Brown touted the qualifications of the back-up servicers.

318.   Several days later, on or about May 7, 1998, Western Asset had a conference call with Tom Hourican, an employee of Chase.

319.   During that conference call, Chase discussed with Western Asset the following:

- the history of CFS and its ability to estimate the value of the credit card debt and collect that value;

- the ECR model was described as a demographics model, back tested on FDIC loans, and that the model looked conservative compared to actual collections;

- Chase described how it had analyzed one CFS securitization: that CFS had estimated the number of converted loans and their collections as follows: that 16% of debtors would convert; that debtors on converted loans would agree to pay 90% of the total debt; that 31% of the debtors who converted their loans would later default;

- Chase had calculated recoveries on converted loans much more conservatively: that 8% of debtors would convert; that the debtors who converted would agree to pay 65% of the total debt; that 50% of the debtors who converted their loans would later default;

- that historically CFS collects more than what it predicts it will collect; that all but 2 prior deals were above base case collection levels, and that all deals were well above stress case;

- that recession was a risk of the notes, but that historically CFS had done well or better in periods of economic downturns, cited by their experience in 1990-91.

320.   B.T. Alex Brown or Chase delivered to Western Asset certain due diligence materials on SMART 97-5. After the May 7, 1998 conference and prior to purchasing the Notes issued by the Great 1998A Trust, a Chase salesman told Western Asset that the dip in collections

in March 1998 was due to a switch in collection procedures including a switch to a 24 hour a day/7 days a week collection schedule.

321.   After the May 7, 1998 conference call and prior to purchasing Notes issued in connection with the Great 1998 A Trust, Western Asset spoke to representatives of Moody's.

322.   On or about June 30, 1998, Western Asset Management Company, on behalf of certain of its clients, purchased approximately Fourteen Million ($14,000,000,000) Dollars in GREAT 98-A Notes as follows:

| Purchaser | Face Amount of Notes |
|---|---|
| Western Asset Limited Duration Portfolio | $560,000 |
| Curtis Bay Insurance Co., Ltd. | 120,000 |
| St. George Corporation | 1,340,000 |
| AF Portfolio Limited | 6,160,000 |
| Bayer Corporation Master Trust | 1,400,000 |
| Unisys Master Trust | 3,100,000 |
| R.J. Reynolds Company Defined Benefit Master Trust | 402,000 |
| Nabisco Inc. Defined Benefit Trust | 268,000 |

323.   The Western Asset Plaintiffs made the aforementioned purchase of Notes issued by GREAT 98-A in reliance on the representations and documentation described herein, the due diligence material CFS and other defendants provided in connection with the GREAT 98-A Trust, the Private Placement Memorandum for GREAT 98-A, the financial statements of CFS, and other information describing CFS' historical collection performance.

324.   At no time prior to the purchase by Western Asset of the Great 1998 A notes did anyone tell Western Asset about the sales of the credit card collateral to Cadle & Co., Dimat, or any other entity, the reasons for those sales, or the impact of those sales on the historical collection performance by CFS.

### The AmerUs Plaintiff

The AmerUs Plaintiff's Reliance on
Defendants' Fraudulent Statements and Omissions

325.    AmerUs was first solicited to participate in the SMART Transactions in or about

late January or early February 1997.  Throughout February and early March 1997, Darrin Smith

at AmerUs had communications with Chase Securities regarding SMART 97-2 and CFS.  In the

course of those communication, Chase Securities made statements about, among other things, the

purported strengths of CFS' management and personnel, CFS' collection approach and

operations, its model for predicting collections from a portfolio of credit card receivables, CFS'

historic collections performance and the "conservatism" built into CFS' Base Case and Stress

Case cash flow models.  For example:

- In a phone call with Chase on or about February 1997, Andy Dym and Terri Pierle
  stated, among other things, that the certificates were "overcollateralized" by a ratio
  greater than 2.1 times.  Dym and Pierle also stated that the Base Case and Stress Case
  cash flow models in the Due Diligence Book were very conservative given the
  collection history, and, even under the Stress Case scenario, there would be no loss of
  principal.

- In or about February 1997, Chase stated to AmerUs that CFS' proprietary systems
  were very intensive and would immediately flag any missed payments by obligors on
  payment plans.  In addition, Chase stated that there was "no equal back-up servicer"
  to CFS.

326.    AmerUs Life Insurance Company purchased $3,000,000 in SMART 97-2

Certificates.  AmerUs purchased the certificates in reliance upon, among other things:

- the representations by defendants described above;

- representations made in the Due Diligence Book for SMART 1997-2;

- representations made in the PPM for SMART 1997-2;

- representations by defendants that CFS had developed an extensive and proprietary
  model to evaluate portfolios of credit card receivables that estimated expected cash
  flows based upon its past experience;

- representations by defendants that CFS had developed a proven collection process that had provided excellent returns;

- representations by defendants that pricing for the SMART 97-2 Certificates was based upon an assumption that CFS would collect at least 90% of the ECR to add conservatism to the investment;

- representations by defendants that the SMART 1997-2 Certificates were "overcollateralized", having an ECR of $221 million, and being protected by a multiple of 2.1 times;

- representations by defendants that even under the Stress Case, which assumed significant deterioration in the collectability of the receivables, certificates would be repaid in full;

- representations by defendants that CFS account officers would take steps to ensure that credit card obligors honored payment plans arranged with CFS, including contacting the obligors immediately after a payment went unpaid;

- representations by defendants that CFS had invested heavily in its employees and technology and information systems.

AmerUs' Participation in SMART 97-4
in Reliance upon Defendant's Fraudulent Statements and Omissions

327.    In or about July 1997, AmerUs was solicited to purchase securities issued in the SMART 97-4 Transaction. During July 1997, Chase Securities had communications with Darrin Smith concerning the SMART 97-4 Transaction and CFS.  For example:

- On July 30, 1997, Jamie Egbert, Terri Pierle and Hardy Viener sent AmerUs analysis prepared by Chase Securities and relating to the SMART 97-4 Transaction.  The tables included statistics for the expected "Gross Collections" and for "Expected Collections Available for Debt Service" under the Base Case and Stress Case. Representations were made in that analysis that there would be $349 million of net cash flow collections under the Base Case and approximately $229 million under the Stress Case.

328.    AmerUs purchased $1,100,000 in SMART 97-4 Certificates in reliance upon, among other statements and omissions, each of the representations on which AmerUs relied in purchasing the SMART 97-2 Certificates.  In addition, AmerUs relied upon:

- the additional representations by defendants described above;

- representations made in the Due Diligence Book for SMART 1997-4;

- representations made in the PPM for SMART 1997-4;

- performance statistics reported in CFS" Monthly Statements sent to AmerUs;

- representations by defendants that the SMART 97-4 Certificates were overcollateralized, having an expected net cash flow collection of $349 million under the Base Case and approximately $229 million under the Stress Case, amounts equal to approximately 198% and 130%, respectively, of the original balance of the notes;

- CFS' financial statement as of March 30, 1997, including its reported total assets and total equity, and its reported net income and total revenues for the first quarter of 1997;

<p style="text-align:center">AmerUs' Participation in GREAT 1998-A<br>in Reliance upon Defendant's Fraudulent Statements and Omissions</p>

329.   In May, 1998, CFS and Chase Securities solicited AmerUs to participate in a transaction under which receivables held in the SMART Trusts would be transferred to a master trust, and investors would exchange their SMART Certificates for certificates issued by the new, master trust.  CFS and Chase stated that the master trust would be advantageous to investors because a single, master trust would provide diversification in the form of a larger asset pool, would enable CFS to collect more efficiently, and would eliminate legal restrictions on CFS' ability to collect from the substantial numbers of individual obligors liable for receivables in two or more SMART Trusts.

330.   In June, 1998, AmerUs exchanged its SMART 97-4 Certificates for notes issued by GREAT 98-A in reliance on, among other statements and omissions, each of the representations and omissions on which AmerUs relied in purchasing the SMART 97-4 certificates.  In addition, AmerUs participated in the exchange in reliance upon:

- the representations by defendants described above;

- representations made in the Due Diligence Book for GREAT 1998-A;

- representations made in the PPM for GREAT 1998-A;

<p style="text-align:center">105</p>

- CFS' financial statement as of December 31, 1997, including its reported total assets and total equity, and its reported net income and total revenues for 1997;

- representations made in the April 8, 1998 letter purporting to explain the March 1998 decline in collections.

<u>COUNT I</u>
Violation of Section 10(b) of the 1934 Act
and SEC Rule 10(b)(5)
(Against Bartmann, Jones, Brady, Welsh, Temple and Chase Securities)

331.     Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 330 as if fully set forth herein.

332.     Bartmann, Jones, Brady, Welsh, Temple and Chase Securities, knowingly or recklessly participated in a scheme or common course of conduct, which included:

- misrepresenting CFS' historical performance at collecting credit card receivable from obligors;

- attesting to the validity of CFS' collections model knowing that its predictions did not comport with actual performance and that it was based on assumptions that were unreasonable;

- touting the strengths of CFS' systems, operations and procedures knowing that CFS' operations were in disarray;

- failing to disclose that CFS' actual monthly collections lagged substantially behind CFS' initial 'base case' predictions;

- hiding the sale of millions of dollars credit card receivables;

- failing to disclose that CFS could not fulfill its servicing obligations on existing Trusts without securitization revenues from future Trusts;

- distorting the reasons for Vernick's resignation by stating that Vernick resigned because of "philosophical" differences while concealing the fundamental reason, Vernick's belief that CFS did not have the ability to generate collections sufficient to make principal and interest payments on the SMART notes; and

- manipulating CFS records such that CFS 'unperforming' credit card receivables were reported as 'performing' receivables.

333.    Each of these statements and omissions, as well as the other false and misleading statements and omissions alleged in this Complaint, were material to Plaintiffs' decisions to purchase their SMART and GREAT notes.

334.    As a result of the above-described acts of Bartmann, Brady, Jones, Welsh, Temple and Chase Securities, they, severally and in concert, directly and indirectly, by use of the mails and means and instrumentalities of transportation and communication in interstate commerce, have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(i)     employed devices, schemes and artifices to defraud Plaintiffs;

(ii)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances in which they were made not misleading; and

(iii)   engaged in acts, practices and a course of business which operated a fraud and deceit upon Plaintiffs in connection with Plaintiffs' purchases of the SMART and GREAT notes.

335.    Each of Bartmann, Brady, Jones, Welsh, Temple and Chase Securities knew of or recklessly failed to uncover the fraud committed at CFS in connection with misstatements and omissions regarding CFS' historical performance, CFS collections model, and CFS systems, operations and procedures.  By knowingly or recklessly performing his or her duties in a manner that allowed the fraud to continue, each of these Defendants provided substantial assistance to the fraud perpetrated at CFS.

336.    Defendants' scheme, including the misstatements and omissions related to the SMART 96-2, SMART 96-4, SMART 97-2, SMART 97-3, SMART 97-4, SMART 97-5, SMART 97-6, SMART 98-1 and GREAT 98-A offerings, and including but not limited to those

contained in the private placement memoranda, due diligence materials, and in other written and

oral statements made in connection with the sale of notes in these offerings, caused the price

Plaintiffs paid for the SMART and GREAT notes to be vastly inflated.  Further, these

misstatements and omissions concern the very reasons Plaintiffs bought the SMART and

GREAT notes at an inflated value, namely CFS' supposed 'superior' collection ability, its

supposedly consistent historical results, and its purportedly reasonable model.

337.    Plaintiffs, at the time of the representations and omissions, did not know of the

false and misleading nature of those statements, and believed them to be true.  In reliance upon

the misrepresentations and omissions, and unaware of the truth, Plaintiffs were induced to and

did purchase the SMART and GREAT notes in the SMART 96-2, SMART 96-4, SMART 97-2

through 6, SMART 98-1 and GREAT 98-A offerings.  Had Plaintiffs known the truth, Plaintiffs

would not have bought the SMART and GREAT notes in these offerings.

338.    As a direct result of Defendants' misstatements and omissions, and the disclosures

of same, the market price of Plaintiffs' securities fell and Plaintiffs have been damaged in an

amount to be established at trial.

<div align="center">

COUNT II
Violation of Section 20(a) of the 1934 Act
(Against Bartmann, Kathryn Bartmann, Jones,
Brady, Temple and Chase Securities)

</div>

339.    Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 338 as

if fully set forth herein.

340.    At all times relevant to this claim, Bartmann, Kathryn Bartmann, Jones, Brady

and Temple were controlling persons of CFS within the meaning of Section 20(a) of the 1934

Act.

341.   Bartmann served as CFS' president and chairman, and was a member of CFS board of directors from 1985 until 1998.  Bartmann also owned a substantial share of CFS' common stock.

342.   Kathryn Bartmann was CFS' CEO and was a member of CFS' board of directors from 1985 until 1998.  Kathryn Bartmann also owned a substantial share of CFS' common stock.

343.   Jones was the Executive Vice President of CFS and a member of CFS' board of directors from 1995 to 1998.  Jones also owned a substantial share of CFS' stock.

344.   Brady was the CFS director of investor relations from at least 1995 until 1998.  In that position she controlled information distributed to potential and existing investors.

345.   Temple was the Chief Financial Officer of CFS and a member of its Executive Committee.  In that position, he controlled information concerning CFS' financial affairs, including its financial statements.

346.   But for the automatic stay under the Bankruptcy Code, CFS would be liable to Plaintiffs as a primary violator under Section 10(b).

347.   By virtue of their positions, Bartmann, Kathryn Bartmann, Jones, Brady and Temple participated in and exercised control over the management of CFS, and had the power and ability to control and direct their acts and conduct complained of herein.  In particular, at all times relevant to the claims herein, these Defendants had the power and influence to direct CFS to remedy its inaccurate disclosures about its historical performance, its collection abilities and the reasonableness of its model, and to direct CFS to make full and accurate disclosures in connection with the sale of securities in the SMART 96-2, SMART 96-4, SMART 97-2 through 6, SMART 98-1 and GREAT 98-A offerings.  By failing to correct these misstatements and

omissions, and ignoring this mismanagement of their subordinates as alleged herein, each of

these Defendants participated in and gave assistance to the fraud committed at CFS.

348.    From at least January 1997 until 1998, Chase Securities was a controlling person

of CFS within the meaning of Section 20(a) of the 1934 Act.  Chase Securities, through its agent,

Zarilli, had daily contact with Bartmann and other CFS executives, and had the power to direct,

through Bartmann, the manner in which CFS deployed its assets and made disclosures to

potential and existing investors in the SMART and GREAT notes.  In particular, from early 1997

on, Chase Securities had the power and influence to direct CFS to remedy immediately the

inaccurate disclosures about its historical performance, its collection abilities and the

reasonableness of its model, and to direct CFS to make full and accurate disclosures in

connection with the sale of securities in the SMART 97-2 through 6, SMART 98-1 and GREAT

98-A offerings.  By failing to correct these misstatements and omissions, and ignoring the

mismanagement perpetrated by CFS' executives alleged herein, Chase Securities participated in

and gave assistance to the fraud committed at CFS.

349.    Plaintiffs relied to their detriment on the misrepresentations and omissions

perpetrated by CFS as the result of the failure of Bartmann, Kathryn Bartmann, Jones, Brady and

Chase Securities to exercise their power and influence over CFS to prevent and correct such

misrepresentations and omissions.

350.    Bartmann, Kathryn Bartmann, Jones, Brady, Temple and Chase Securities are

jointly and severally liable to Plaintiffs for Plaintiffs' damages in an amount to be proved at trial,

with and to the same extent as CFS had CFS not obtained the protection of the Bankruptcy

Code's automatic stay.

## COUNT III
### Violations of Section 408(a) of the Oklahoma Securities Act
### (Against Bartmann, Brady, Welsh, Temple and Chase Securities)

351.   Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 350.

352.   Bartmann, Brady, Welsh, Temple and Chase Securities offered and/or sold securities to Plaintiffs by means of untrue statements of material fact and/or omissions of material fact necessary to make the statements, in light of the circumstances in which they were made, not misleading.

353.   Bartmann, Brady, Welsh, Temple and Chase Securities actively and directly participated in the solicitation of the sale of securities to Plaintiffs by means of untrue statements of material fact and/or omissions of material fact necessary to make the statements, in light of the circumstances in which they were made, not misleading.

354.   Bartmann, Brady, Welsh, Temple and Chase Securities made representations to Plaintiffs concerning CFS' historical performance, the validity of CFS' collection predictions, and the purported strengths of its systems, operations, strengths and procedures.  These representations were false or grossly misleading because they concealed several significant material facts, including:  that CFS' operations were in disarray; that CFS was unable to fulfill its servicing obligations without raising additional cash through additional securitizations; that CFS' actual monthly collections from credit card obligors lagged substantially behind CFS' initial "base case" predictions; and that CFS sold, in bulk, millions of dollars of credit card debt from several of the SMART portfolios to obtain the immediate infusion of cash necessary to meet interest and principal payments and to report collection results in line with the performance standards established by its model.

355.   Further, these Defendants failed to disclose to Plaintiffs that Vernick's analysis of actual performance that showed that CFS' model had no predictive ability and that actual collection results did not correlate in any way with the performance expectations of the model.

356.   Instead of fully reporting these structural problems to Plaintiffs, Bartmann, Brady, Welsh, Temple and Chase Securities continued to sell CFS as a superior debt collector and the model as a valid means of predicting credit card debt collections by, among other things, distributing the false and misleading CFS private placement memoranda, providing noteholders with performance statistics that masked CFS' reliance on bulk credit card debt sales, and oral representations made at due diligence sessions in Tulsa, the Super Bowl 'seminars' in 1997 and 1998 and in one-on-one sales presentations with Plaintiffs, as alleged in this Complaint.

357.   Plaintiffs did not know of such untruths and omissions.

358.   Plaintiffs hereby tender the securities to Bartmann, Brady, Welsh, Temple and Chase Securities.

359.   As the result of the above misrepresentations and omissions, Plaintiffs purchased notes in the SMART 96-2, SMART 96-4, SMART 97-2 through 6, SMART 98-1 and GREAT 98-A offerings at inflated prices.

360.   Upon disclosure of the above misrepresentations and omissions, the market price of the notes Plaintiffs purchased in the SMART and GREAT offerings fell and Plaintiffs suffered damages in an amount to be proven at trial.

<u>COUNT IV</u>
Violations of Section 408(b) of the Oklahoma Securities Act
(Against Bartmann, Kathryn Bartmann, Brady,
Jones, Welsh, Temple and Chase Securities)

361.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 360

above.

362.    As set forth above, Chase Securities, Bartmann, Brady, Welsh and Temple

violated Section 408(a) of the Oklahoma Securities Act.  But for the automatic stay under

11 U.S.C. § 362, CFS would be liable for violating Section 408(a) of the Oklahoma Securities

Act.

363.    Bartmann and Brady violated Section 408(b) of the Oklahoma Securities Act by

aiding and materially participating in the sales to Plaintiffs in at least the following ways:

- Drafting and circulating private placement memoranda and due diligence materials in connection with all SMART and GREAT offerings that they knew or should have known contained material misstatements and omissions regarding CFS' historical performance, collections systems and procedures and models;

- Making oral and other written representations to Plaintiffs in Oklahoma and elsewhere containing the same falsehoods;

- Circulating inaccurate and misleading progress reports and monthly reports;

- Giving false explanations for the downturns in reported 'collections' in March 1997 and 1998;

- Telling falsehoods about the reasons Vernick resigned in May 1997;

- Hiding the bulk credit card receivable sales CFS made to Cadle and Dimat.

364.    Bartmann violated Section 408(b) of the Oklahoma Securities Act by controlling

CFS in the following ways:

- By exercising his power as Chairman of CFS, president and substantial shareholder of CFS who oversaw all the operations of CFS, and in particular, the statements made to potential and existing SMART and GREAT investors.

113

365.    Brady violated Section 408(b) of the Oklahoma Securities Act by controlling CFS in the following ways:

- By exercising her power as CFS Director of Investor Relations who distributed the false and misleading statements alleged herein to potential and existing SMART and GREAT investors.

366.    Jones violated Section 408(b) of the Oklahoma Securities Act by aiding and materially participating in the sales to Plaintiffs by concealing CFS' actual performance collecting from credit card obligors.  Jones actively concealed CFS' actual performance by, among other means, financing and arranging Dimat's sham purchases from the SMART Trusts and by manipulating CFS' computer records to misstate the number of loans that had been converted from Non-performing to Performing loans.

367.    Welsh violated Section 408(b) of the Oklahoma Securities Act by aiding and materially participating in the sales to Plaintiffs in at least the following ways:

- Making oral and other written representations to Plaintiffs in Oklahoma and elsewhere containing the falsehoods;

- Hiding the bulk credit card receivable sales CFS made to Cadle and Dimat.

368.    Temple violated Section 408(b) of the Oklahoma Securities Act by aiding and materially participating in the sales to Plaintiffs in at least the following ways:

- Making oral and other written representations to Plaintiffs in Oklahoma and elsewhere containing the same falsehoods;

- Hiding the bulk credit card receivable sales CFS made to Cadle and Dimat.

369.    Temple violated Section 408(b) of the Oklahoma Securities Act by controlling CFS and exercising his power as CFO of CFS who distributed the false and misleading financial statements as alleged herein to potential SMART and GREAT investors, including Plaintiffs.

370.    Kathryn Bartmann violated Section 408(b) of the Oklahoma Securities Act by controlling CFS in her capacity as CEO, director and substantial shareholder of the Company and exercising her power and influence to permit the misrepresentations and omissions alleged in this Complaint.

371.    Chase Securities violated Section 408(b) of the Oklahoma Securities Act by aiding and materially participating in the sales to Plaintiffs in the following ways:

- Drafting and distributing private placement memoranda and due diligence materials in connection with the SMART 97-2 through 6, SMART 98-1 and GREAT 98-A offerings, that contained misrepresentations and omissions regarding CFS' historical performance, systems and procedures and models;

- Making other written and oral misrepresentations about the falsehoods alleged in this Complaint, including Vernick's resignation, the down turn in reported collections in March 1997 and 1998, the default under the Chase Manhattan Bank Warehouse line of credit.

372.    Bartmann's, Jones's, Brady's, Welsh's, Temple's, Kathryn Bartmann's and Chase Securities' conduct in violation of Section 408(b) caused Plaintiffs damage.

## COUNT V
### Common Law Fraud
(Against Bartmann, Jones, Brady, Welsh, Temple and Chase Securities)

373.    Plaintiffs reallege and reincorporate the allegations in paragraphs 1 through 372.

374.    Defendants Bartmann, Jones, Brady, Welsh, Temple and Chase Securities made material misrepresentations and/or omissions of material fact as detailed in this Complaint, including misstatements and omissions regarding CFS' historical performance, the competence of its collection systems and procedures, and the reasonableness of its models.  Further, these Defendants told falsehoods or withheld the full truth about Vernick's resignation, CFS' bulk sales of credit card receivables, and the sales of receivables to related party Dimat.  Further,

Defendants never disclosed that CFS could not meet its servicing commitments without further securitizations.

375.    With regard to each misstatement and omission set forth in this Complaint, Defendants had a duty to fully and truthfully disclose all material information when they solicited Plaintiffs' purchases in the SMART and GREAT offerings.

376.    CFS, Bartmann, Jones, Brady, Welsh, Temple and Chase Securities made these misrepresentations and/or omissions of material fact with knowledge of the falsity, or in reckless disregard of the truth, of their representations.

377.    CFS, Bartmann, Jones, Brady, Welsh, Temple and Chase Securities engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiffs.

378.    Defendants made these misrepresentations and/or omissions of material fact with knowledge of the falsity, or in reckless disregard of the truth, of their representations.

379.    Defendants made these misrepresentations of material fact with the intent that Plaintiffs would rely on them in making their decisions regarding whether to purchase or sell the SMART and GREAT securities.  Further, Defendants made the omissions of material fact detailed above with the intent that Plaintiffs would rely on the incomplete and false information that they had been provided in making their decisions regarding whether to purchase or sell the SMART and GREAT securities.

380.    Plaintiffs justifiably relied upon Defendants' misrepresentations and/or omissions of material fact to their detriment.  Had Plaintiffs known the true facts, they would not have purchased the securities.

381.     Defendants' misrepresentations and/or omissions of material fact proximately caused Plaintiffs to suffer damages, in an amount to be determined at trial, as a result of their purchases of notes in the SMART and GREAT offerings.

<u>COUNT VI</u>
Negligent Misrepresentation
(Against Bartmann, Brady and Chase Securities)

382.     Plaintiffs reallege and reincorporate the allegations in Paragraphs 1 through 381.

383.     Bartmann, Brady and Chase Securities supplied information for the guidance of Plaintiffs and other investors in deciding whether to invest in the SMART and GREAT securitizations.

384.     Bartmann, Brady and Chase Securities knew that Plaintiffs and other investors would rely on their representations in deciding whether to invest in the SMART and GREAT securitizations.

385.     Bartmann, Brady and Chase Securities had access to, and relied upon, inside information about CFS that was neither available to the public nor to Plaintiffs and other investors in the SMART and GREAT securitizations.

386.     In connection with the sale of notes in the SMART and GREAT offerings, Bartmann, Brady and Chase Securities owed Plaintiffs a duty of care to make accurate and full disclosure regarding CFS, its historical performance, collection systems and abilities and the reasonableness of its model.  With regard to each omission contained in these paragraphs, the defendants had a duty to fully and truthfully disclose the information withheld.

387.     Bartmann, Brady and Chase Securities negligently made material misrepresentations and/or omissions of material fact as detailed in this Complaint, including representations to Plaintiffs concerning CFS' historical performance, the validity of CFS'

collection predictions, and the purported strengths of its systems, operations, strengths and procedures. These representations were false or grossly misleading because they concealed several significant material facts, including: that CFS' operations were in disarray; that CFS was unable to fulfill its servicing obligations without raising additional cash through additional securitizations; and that CFS' actual monthly collections from credit card obligors lagged substantially behind CFS' initial "base case" predictions.

388.    Bartmann, Brady and Chase Securities failed to disclose to Plaintiffs and other investors that CFS sold, in bulk, millions of dollars of credit card debt from several of the SMART portfolios to obtain the immediate infusion of cash necessary to meet interest and principal payments and to report collection results in line with the performance standards established by its model.

389.    Bartmann, Brady and Chase Securities failed to disclose to Plaintiffs and other investors that Chase Securities learned from Vernick that analysis of actual performance showed that CFS' model had no predictive ability as actual collection results did not correlate in any way with the performance expectations of the model. Instead of fully reporting these structural problems to Plaintiffs and other investors, these Defendants continued to sell CFS as a superior debt collector and the model as a reasonable means of predicting credit card debt collections. Defendants did this by distributing the false and misleading CFS private placement memoranda, by providing noteholders with performance statistics that masked CFS' reliance on bulk credit card debt sales, and through oral representations made at due diligence sessions in Tulsa, the Super Bowl 'seminars' in 1997 and 1998 and in one-on-one sales presentations with potential Plaintiffs.

390.    Bartmann, Brady and Chase Securities made these misrepresentations of material fact with the intent that Plaintiffs would rely on them in making their decisions regarding whether to purchase or sell the securities issued in the SMART and GREAT securitizations. Further, Bartmann, Brady and Chase Securities made the omissions of material fact detailed above with the intent that Plaintiffs would rely on the incomplete and false information that they had been provided in making their decisions regarding whether to purchase or sell the securities issued in the SMART and GREAT securitizations.

391.    Plaintiffs justifiably relied upon Defendants' misrepresentations and/or omissions of material fact to their detriment.  Had Plaintiffs known the true facts, they would not have purchased the securities issued in the SMART and GREAT securitizations.

392.    Defendants' negligent misrepresentations and/or omissions of material fact proximately caused Plaintiffs to be injured in an amount to be determined at trial.

393.    Chase Securities also sent charts and graphs to Plaintiffs that purported to show CFS' collections performance on outstanding SMART Transactions.  For example, in July 1997, in connection with efforts to sell securities in the SMART 97-4 Transaction, Terri Pierle of Chase Securities sent a set of graphs to potential investors, including certain plaintiffs, on Chase Securities' stationery, purporting to show that CFS collections for the SMART 96-4, SMART 97-1, SMART 97-2 and SMART 97-3 Trusts were exceeding the "base case" projections.  In September 1997, Hardy Viener of Chase Securities sent potential investors, including certain plaintiffs, in connection with efforts to sell securities in the SMART 97-5 Transaction, on Chase Securities' stationery, a series of charts purporting to show that CFS' collections for the SMART 96-2 through SMART 97-4 Transactions were exceeding base case predictions.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     enter judgment in favor of Plaintiffs and against the Defendants for damages sustained by Plaintiffs or, in the alternative;

(b)     enter an order rescinding Plaintiffs' purchases of SMART and GREAT notes from Chase Securities and requiring Chase Securities to refund the purchase amounts to Plaintiffs;

(c)     order Defendants to pay prejudgment interest;

(d)     award Plaintiffs the costs and expenses of this action, including reasonable attorney fees; and

(e)     grant such other and further relief as the Court finds is just under the circumstances.

Respectfully submitted,

David L. Bryant, OBA #1262
BRYANT LAW FIRM
400 Beacon Building
406 S. Boulder Avenue
Tulsa, Oklahoma  74103
Tel.:  918-587-4200
Fax:   918-587-4217

OF COUNSEL
Jeffrey T. Gilbert
SACHNOFF & WEAVER, LTD.
30 South Wacker Drive
Suite 2900
Chicago, Illinois  60606
(312) 207-1000